MARK D. DEAN, P.S.C., Appellant

v.

COMMONWEALTH BANK & TRUST COMPANY, Appellee.

No. 2012–SC–000267–DG.

Supreme Court of Kentucky.

June 19, 2014.

Laurence John Zielke, Nancy Jane Schook, Karen Denise Campion, Zielke Law Firm, PLLC, Louisville, KY, Counsel for Appellant.

John T. McGarvey Eric Michael Jensen Bradley Scott Salyer Morgan & Pottinger, P.S.C. Louisville, KY, Counsel for Appellee.

William Hickman III, Jones & Hickman, P.S.C., Pikeville, KY, Debra Kaye Stamper, Kentucky Bankers Association General Counsel, Louisville, KY, Counsel for Amicus Curiae, Kentucky Bankers Association.

Opinion of the Court by Justice NOBLE.

The Appellant, Mark D. Dean, P.S.C, had an escrow account with the Appellee, Commonwealth Bank & Trust Company, and had authorized an employee to sign checks on the account by herself and had proclaimed to the bank that she was acting on the firm's behalf. The employee then engaged in a fraudulent scheme by which she would write checks on the account and then deposit them in another of the firm's accounts at another bank. More than three years after the last activity on the account, the firm filed Uniform Commercial Code and common-law claims against the bank. The questions presented by this case are whether those claims are barred either by the one-year repose period of KRS 355.4–406, as determined by the Court of Appeals, or alternatively by the three-year statute of limitations under KRS 355.4–111. This Court concludes that the claims are barred by the statute of limitations and thus affirms the Court of Appeals albeit for different reasons.

## I. Background

Mark D. Dean, P.S.C. is a law firm in Shelbyville, Kentucky. The firm's sole owner is Mark Dean, a lawyer, whose primary area of practice is real estate law, including real estate closings. The firm maintained escrow accounts at multiple banks.

In 1998, Dean opened a business checking account for the firm with Commonwealth Bank to be used as an escrow account. Dean and Jody Wills, the firm's bookkeeper and secretary until May 2005, were authorized signatories on the account. Specifically, "Authorized Signature" is printed above each of their signatures on the bank's signature card. The signature card states that the "undersigned is (are) acting on behalf of the business entity." Only one signature was required for any transaction on the account.

In September 2003, Jody Wills began embezzling money from the firm's various escrow accounts. She furthered her thefts with a method known as check-kiting,[1]

---

1. "Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the

which involved her writing and depositing checks between the Commonwealth Bank account and Dean's account at Citizens Union Bank. Wills used both preprinted checks and blank counter checks (i.e., blank checks on which the teller writes the account number) provided directly to her by the tellers at Commonwealth Bank. She made these checks payable to Mark D. Dean P.S.C and then deposited them into the Citizen Union account. She also deposited checks from Citizens Union Bank into the Commonwealth Bank account, usually just before drawing the checks on the Commonwealth Bank account.

The exact scheme Wills then used to divert the firm's funds to herself is not described in the briefs, nor is it apparent from the record.[2] The briefs claim only that she used check-kiting. This explains how she artificially inflated and maintained illusory balances in the Commonwealth

kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the 'float' time, an artificial balance is created." *United States v. Stone*, 954 F.2d 1187, 1188 n. 1 (6th Cir.1992).

[A] check-kiting scheme typically works as follows: The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.

By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks....

*Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (internal quotation marks omitted, ellipsis in original).

The person engaging in the kite usually withdraws some or all of the artificially inflated funds, and frequently increases the size of the kite over time as he or she "uses more and more of the funds in the balance" until the kite eventually collapses. A. Brooke Overby, *Allocation of Check Kiting Losses Under the UCC, Regulation CC, and the Bankruptcy Code: Reconciling the Standards*, 44 Wake Forest L.Rev. 59, 63 (2009). The kite "collapses" "either in the rare case when the customer deposits 'good funds' to cover the overdraft(s) created by the kite and begins to write checks only on collected funds or, more likely, when one payor bank withdraws from the kite by dishonoring checks presented to it for payment." *Id.* at 66.

Usually, one of the banks is the victim of a check-kiting scheme, which constitutes bank fraud under 18 U.S.C § 1344, once the kite collapses. *Id.; see also* Thomas E. McCurnin & Peter A. Frandsen, *Grounding Check Kiting with Check 21: The Civil and Criminal Ramifications of Check Kiting in the 21st Century*, 125 Banking L.J. 295, 297 (2008) ("Bank kites can be disastrous for a bank, and the losses of kites have caused banks to close or have seriously impacted their cash reserves."). In essence, a check-kiting scheme is much like a game of hot potato, Overby, *supra*, at 78, except with real consequences for the bank left holding the check when the music stops.

This case is unusual in that the account holder—the firm—was not engaged in the check-kiting. Instead, the perpetrator was the firm's employee.

**2.** For example, the firm's complaint states only that she "unlawfully divert[ed] Dean's funds for her own use."

Bank account and the Citizens Union Bank account. But an additional step, such as writing checks to herself or to fictitious payees, or withdrawing cash, must have been taken to siphon money from one of the artificially inflated accounts. The only checks complained of in this case are those drawn on the Commonwealth Bank account and made payable to Mark Dean P.S.C., which were then deposited in the Citizens Union account. There is no allegation that Wills wrote checks to herself or a fictitious payee on, or withdrew cash from, the Commonwealth Bank account. Thus, again presumably, she must have taken money from the Citizens Union account somehow.[3] Whatever the exact method, over the course of several years, she stole over $800,000 from Dean's accounts using this method.

Each month, Commonwealth Bank sent detailed statements of the account's activity, along with copies of all checks, counter checks, and deposit slips, to the address listed on the signature card. Many of the checks were signed by Wills, and several were for large amounts. Wills intercepted the monthly statements to prevent the kiting scheme from being discovered; Commonwealth Bank does not dispute this.

In January 2005, Commonwealth Bank learned of suspicious activity on the account suggesting check-kiting. Belinda Nichols, the bank's market president for Shelbyville, claims that she met with Dean on February 1, 2005 to discuss the suspicious activity. (Dean claims he did not learn of any suspicious activity until several years later, implying either that this meeting did not occur or that it concerned some other subject.) Shortly after, a hold was placed on the account, and the last activity on the account was in March 2005.

At some point, the FBI began investigating the suspected check-kiting scheme. Dean claims that he first learned of the suspicious activity on his account when informed of it by the FBI in September 2008. Until that point, he claims, he was not even aware that any funds were missing from any of the accounts, much less that Wills had stolen them.[4]

Dean, as the sole owner of the law firm, believed Commonwealth Bank had breached its duty to protect the account from theft. Thus, on January 23, 2009, the firm sued the bank, raising four claims. The first claim was that the bank had violated Articles 3 and 4 of the Uniform Commercial Code. The other three claims raised common-law causes of action: (1) "Aiding and Abetting Fraud and Illegal Activity and Breach of Duty of Ordinary Care"; (2) "Common Law Negligence"; and (3) "Breach of Contract and Breach of Duty of Good Faith and Fair Dealing." The firm also sought punitive damages in a separate count.

Commonwealth Bank moved for summary judgment on all claims, arguing that the UCC claim was barred by the three-year statute of limitations, KRS 355.4–111, and that the common-law claims were displaced by the UCC. The circuit court granted the motion as to the UCC claim, reasoning that the discovery rule did not apply to UCC claims absent fraudulent

---

**3.** Citizen's Union Bank was not named in the suit, and there is no suggestion that it was ever sued by the firm over the facts of this case. One of Commonwealth Bank's employees, at the very end of her deposition, was asked if she was aware of any kiting losses suffered by Citizens Union, and she replied that she was not aware of any.

**4.** Wills was eventually indicted in Shelby Circuit Court and pleaded guilty to more than 35 felony theft-by-deception counts. *See Wills v. Commonwealth*, 396 S.W.3d 319, 320 (Ky. App.2013). She was probated and ordered to pay restitution in the amount of $720,000. *Id.* The outcome of her criminal case, however, has no bearing on this appeal.

concealment and thus the claim was filed outside the three-year limitations period.

The court initially declined to enter summary judgment as to the common-law claims. The bank soon renewed its motion as to them, making more specific arguments. The court was finally convinced and entered summary judgment as to the remaining claims, concluding that the firm had failed to identify the violation of any law, regulation, or banking practice that would show the bank had aided or abetted Wills or had been negligent, and that the firm had failed to identify the breach of any provision of the deposit agreement or any other wrongdoing that would support claims for breach of contract and breach of the duty of good faith and fair dealing.

The Court of Appeals affirmed the trial court on slightly different grounds. Specifically, the court concluded that KRS 355.4–406 and the deposit agreement imposed a duty on the firm to "examine the[ ] bank statements in a prompt and reasonable fashion" for unauthorized signatures, including those exceeding actual or apparent authority. Failure to bring unauthorized signatures to the bank's attention within one year is a substantive bar on claims related to those signatures, reasoned the court. The court also concluded that KRS 355.4–406 was applicable to all causes of action related to the checks, whether they were based on the UCC or common law. Because the firm had not complied with KRS 355.4–406 by examining the statements and bringing the allegedly unauthorized signatures to the bank's attention within one year, the court concluded that "KRS 355.4–406 is a dispositive bar to all claims asserted by [the law firm] against Commonwealth [Bank], whether based on the Code or based on common law."

The firm sought discretionary review, which this Court granted.

## II. Analysis

The firm claims the Court of Appeals erred in deciding the appeal based on KRS 355.4–406, claiming that the issue was raised *sua sponte* and was not within the scope of the appeal because it was not raised at or decided by the trial court. The firm also argues that its claims are not barred by KRS 355.4–406 because the statute is inapplicable, the Court of Appeals improperly weighed the facts and construed them against the firm, and, even if the statute does apply, it does not bar common-law claims. The firm also argues that the circuit court improperly weighed the evidence and decided disputed issues of fact in granting summary judgment on the statute of limitations, and improperly applied the UCC statute of limitations to common-law claims. We address these claims in turn as needed.

### A. The Court of Appeals properly considered KRS 355.4–406.

■ The firm first argues that the Court of Appeals should not have decided the appeal on the basis of KRS 355.4–406 because that issue was never presented to or decided by the trial court. This, the firm claims, barred consideration of that statute by the Court of Appeals. The firm's argument, however, is premised on a misunderstanding of the law related to when an appellate court may address an issue not decided by the trial court.

Admittedly, this Court has stated that "[t]he Court of Appeals is without authority to review issues not raised in or decided by the trial court." *Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989). But this Court has also stated that "it is ... the rule in this jurisdiction that the judgment of a lower court can be *affirmed* for any reason in the record."

*Fischer v. Fischer,* 348 S.W.3d 582, 591 (Ky.2011).[5]

In *Fischer,* this Court distinguished specifically between an issue raised for the first time on appeal in support of reversing the lower court, which is not allowed, and a previously un-raised point of law that would support affirming, which is allowed:

> In instances where a trial court is correct in its ruling, an appellate court, which has de novo review on questions of law, can affirm, even though it may cite other legal reasons than those stated by the trial court. The trial court in that instance reached the correct result, and thus will not be reversed. But when an appellate court determines to reverse a trial court, it cannot do so on an unpreserved legal ground unless it finds palpable error, because the trial court has not had a fair opportunity to rule on the legal question.

*Id.* at 589–90. The Court of Appeals used KRS 344.4–406 as an alternative ground for affirming the trial court's grant of summary judgment, which is allowed by our precedent.

 The firm, of course, argues that for an appellate court to address such an alternative issue (or more precisely, an alternative ground for affirming), the issue must be raised by the appellee, whereas here the issue was addressed *sua sponte* by the Court of Appeals. While alternative grounds are frequently addressed because they have been raised by an appellee, *see, e.g., Brown v. Barkley,* 628 S.W.2d 616, 618–19 (Ky.1982), they are not required to be so raised. Indeed, that cannot be a proper requirement, as it would require an appellate court to avoid resolving a case on proper legal grounds and potentially perpetuate erroneous reason-

ing. *See Kentucky Farm Bureau Mut. Ins. Co. v. Shelter Mut. Ins. Co.,* 326 S.W.3d 803, 805 n. 3 (Ky.2010) ("Of even greater concern is that such a requirement could force this Court to affirm and publish an opinion that we know is erroneous for other reasons."). If an appellate court is aware of a reason to affirm the lower court's decision, it must do so, even if on different grounds. *See Fischer v. Fischer,* 197 S.W.3d 98, 103 (Ky.2006) ("If the summary judgment is sustainable on any basis, it must be affirmed.").

The firm nevertheless claims that under this authority, the alternative ground for affirming must have been presented to the trial court. Indeed, our cases frequently qualify the affirmance rule by stating that the alternative ground must appear "in the record," *Fischer,* 348 S.W.3d at 591, or that the alternative theory must have been "properly presented but erroneously rejected by the trial court." *Brown,* 628 S.W.2d at 619.

But the applicability of KRS 355.4–406 was not completely absent from the circuit court proceedings. The bank raised the firm's failure to comply with KRS 355.4–406 as an affirmative defense in its answer to the complaint. And the firm specifically admits in its brief that "the trial court had ... rejected the idea that KRS 355.4–406 was applicable to this case." In addressing the common-law causes of action in its first order, the circuit court stated that Wills was an authorized signatory on the account and thus her signature on the kited checks could not have been an "unauthorized signature," and that the parties had not shown how the checks were alterations. (KRS 355.4–406 concerns unauthorized signatures and alterations.) The court did not go so far as to rule specifical-

---

**5.** This is a different *Fischer* case than that cited and discussed by parties, that case being *Fischer v. Fischer,* 197 S.W.3d 98 (Ky.2006).

That case, however, laid out the same general rule as the later *Fischer* decision. *Id.* at 103.

ly that KRS 355.4–406 did not apply, stating instead that "[i]t is not clear that KRS 355.4–406 applies to the factual circumstances at issue as it relates to the [common-law] causes of action."

Nevertheless, this is sufficient for the issue to both appear "in the record" and for the matter to have been presented to and rejected by the trial court. Regardless, the Court of Appeals was well within its power to consider the issue as an alternative ground for affirming the trial court's grant of summary judgment.[6]

**B. The firm's claims are not barred by KRS 355.4–406 because the signatures in this case were not "unauthorized" as defined in the UCC.**

■ As noted above, the Court of Appeals concluded that KRS 355.4–406 barred the firm's claims because Dean failed both to review the firm's bank statements as required by subsections (3) and (4) and to raise the purported unauthorized signatures with the bank within one year as required by subsection (6).[7] This statute provides that a bank cannot be

---

6. The firm's complaint that allowing affirmance on an alternative theory deprives it of the right to be heard and present arguments is unpersuasive. If an appellate court affirms on an alternative ground, and does so erroneously, the aggrieved party is not without redress, having the right to seek rehearing or, where appropriate, review by a higher court.

7. KRS 355.4–406 states:
 (1) A bank that sends or makes available to a customer a statement of account showing, payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.
 (2) If the items are not returned to the customer, the person retaining the items shall either retain the items or, if the items are destroyed, maintain the capacity to furnish legible copies of the items until the expiration of seven (7) years after receipt of the items. A customer may request an item from the bank that paid the item, and that bank must provide in a reasonable time either the item or, if the item has been destroyed or is not otherwise obtainable, a legible copy of the item.
 (3) If a bank sends or makes available a statement of account or items pursuant to subsection (1) of this section, the customer must exercise reasonable promptness in examining the statement

or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.
 (4) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (3) of this section, the customer is precluded from asserting against the bank:
 (a) The customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and
 (b) The customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty (30) days, in which to examine the item or statement of account and notify the bank.
 (5) If subsection (4) of this section applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply

liable for checks paid on unauthorized signatures as long as the bank sends the required statements to the customer and makes the checks available, and the customer does not exercise reasonable care in discovering and reporting the unauthorized signatures. Additionally, if the customer brings a claim more than one year after the statements are sent out, the claim is absolutely barred. Essentially, the statute creates a safe harbor for the bank after one year by requiring action by the customer within a year (a shorter period than the statute of limitations). For this reason, the statute is "consistently characterized . . . as a statute of repose." *Peters v. Riggs Nat. Bank, N.A.*, 942 A.2d 1163, 1167 (D.C.2008).

The statute, however, applies only to claims based on checks with "unauthorized signatures." [8] *See* KRS 355.4–406(4), (6); *see also Bullitt Cnty. Bank v. Publishers Printing Co., Inc.*, 684 S.W.2d 289, 293 (Ky.App.1984) (suggesting that KRS 355.4–406 "only appl[ies] to the negligence of persons asserting an *unauthorized signature*" (emphasis added)), *superseded in part by amendment of* KRS 355.4–406, 1996 Ky. Acts ch. 130, § 106. The Court of Appeals concluded that the signatures Wills placed on the kited checks were unauthorized. This certainly comports with the common understanding of "unautho-

rized," in the sense that Wills was not authorized to steal from her employer.

But "unauthorized signature" is a defined term under the UCC, and thus is not subject to this common understanding. Instead, "unauthorized signature" means "a signature made without actual, implied, or apparent authority" and "includes a forgery." KRS 355.1–201(2)(ao). "Unauthorized signature is a broader concept that includes not only forgery but also the signature of an agent which does not bind the principal under the law of agency. The agency cases are resolved independently under agency law." U.C.C. § 3–406 Official Cmt. 2 (last rev.2002). Indeed, "[i]f a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract." KRS 355.3–402. And "[i]f the represented person is bound, the signature of the representative is the 'authorized signature of the. represented person' and the represented person is liable on the instrument, whether or not identified in the instrument." *Id.*

The Court of Appeals cited the "unauthorized signature" definition, and then concluded summarily that Wills exceeded her authority and that her signature was

---

with subsection (3) of this section and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (4) of this section does not apply.

(6) Without regard to care or lack of care of either the customer or the bank, a customer who does not within one (1) year after the statement or items are made available to the customer (subsection (1)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded

from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under KRS 355.4–208 with respect to the unauthorized signature or alteration to which the preclusion applies.

8. KRS 355.406 also applies to alterations, but there is no real claim that the checks were alterations as contemplated by the UCC. *See* KRS 355.3–407.

thus unauthorized.[9] The firm does not challenge the Court of Appeals' reading of "unauthorized signature," and instead complains that it could only know the signatures were unauthorized in hindsight and not from the bank statements (though it does suggest that the bank acknowledged at the trial court that the signatures could not be considered "unauthorized").[10]

In applying the definition of "unauthorized signature," the Court of Appeals considered only whether Wills had actual authority to sign the checks. While it is arguably correct that she did not have actual authority to steal from the firm, the few courts that have addressed similar scenarios have held that where there is a clear written manifestation of the employee's authority to sign checks, such as a signature card, then the employee has the authority to do so. *See Honeycutt v. Honeycutt*, 150 Md.App. 604, 617, 822 A.2d 551, 558 (Md.Ct.Spec.App.2003) (holding that "the Bank was legally entitled to release the funds to [the authorized signatory] based upon the express authority created by the signature card" and that "the signature card controlled the transaction"); *see also Atlanta Sand & Supply Co. v. Citizens Bank*, 276 Ga.App. 149, 622 S.E.2d 484, 486 (2005) (holding that corporate resolution and signature card allowing employee authority to sign and endorse checks for deposit gave her authority to do so).

Those courts have sustained summary judgment in favor of the banks. These cases operate on the simple theory that "[i]f a fiduciary [i.e., an agent] is authorized to draw or indorse a negotiable instrument," then he or she "is not guilty of forgery." Marion W. Benfield, Jr. & Peter A. Alces, *Bank Liability for Fiduciary Fraud*, 42 Ala. L.Rev. 475, 481 (1991). Provided the signature card cannot be attacked on other grounds, such as being unlawfully obtained, then it is a reasonable position that the signature card provides actual authority to sign checks drawn on the account.

█ More importantly, however, the circumstances of this case show that Wills had *apparent* authority, which the Court of Appeals failed to address. And apparent authority is different from actual or implied authority: "Apparent authority ... is not actual authority but is the authority the agent is held out by the principal as possessing. It is a matter of appearances on which third parties come to rely." *Mill St. Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky.App.1990).

█ The record demonstrates that Wills had apparent authority, which would be sufficient to make the signatures authorized under the UCC, at least with regard to determining whether KRS 355.4–406 applies to the transaction between the customer and the bank.[11] "An agent is said to

---

**9.** The Court of Appeals did not address whether the signatures were forgeries. They were not. There is no evidence, or even suggestion, that the signatures in question were not actually made by Wills.

**10.** The firm also argues that KRS 355.4–406 is inapplicable to its common-law claims because they are not based on unauthorized signatures and instead are based on the bank's negligence, for example, in providing counter checks to a non-accountholder. Because this aspect of the case is resolved by

concluding that there were no unauthorized signatures, at least as that term is used in the UCC, we do not address the firm's argument in this regard. The related argument that any statute of limitations under the UCC, as opposed to the one-year repose period in KRS 355.4–406, applies to common-law causes of action is addressed separately below.

**11.** This might not affect other statutes' use of the term, or related terms, such as "authorized signature," *see* KRS 355.3–402, that seek

have apparent authority to enter transactions on his or her principal's behalf with a third party when the principal has manifested to the third party that the agent is so authorized, and the third party reasonably relies on that manifestation." *Ping v. Beverly Enterprises, Inc.,* 376 S.W.3d 581, 594 (Ky.2012); *see also Restatement (Third) of Agency* § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

█ The Court of Appeals conflated the notion of an "unauthorized signature" with an unauthorized transaction. But the two concepts are distinct. *See Mid–Continent Specialists, Inc. v. Capital Homes, L.C.,* 279 Kan. 178, 106 P.3d 483, 490 (2005) (discussing "a signature by an authorized signer for an unauthorized purpose," which "apparently is not forgery under the Code, but could be part of an embezzlement" (quoting J. White & Summers, Uniform Commercial Code § 18–4 (4th ed.1995))); *cf. C–Wood Lumber Co., Inc. v. Wayne County Bank,* 233 S.W.3d 263, 277 (Tenn. Ct.App.2007) ("an endorsement by a fiduciary with the authority to endorse and deposit checks payable to the principal is not a forgery under the UCC"). That a principal did not approve an individual transaction (that is, a single instance of a signature) does not change the fact that an agent can have apparent authority to make the signature and thus engage in the transaction, at least when viewed from the perspective of the bank.

In this case, the firm was the principal and was wholly owned by Dean, who was also a signatory. Wills and Dean were the

firm's agents in signing checks on the escrow account. That agency carried over to the kited checks under Wills's apparent authority. "Apparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." *Restatement (Third) of Agency* § 3.03 (2006). The three inquiries, then, are (1) whether the firm manifested that Wills had authority, (2) whether the bank reasonably believed that she had authority based on the manifestations, and (3) whether the bank's belief was directly traceable to the firm's manifestations.

The firm unquestionably manifested that Wills had authority when, through Dean, it allowed her signature to be an "authorized signature" on the escrow account and stated on the signature card that she acted on behalf of the firm. Moreover, the signature card stated that only one signature was necessary, meaning that Wills could sign checks alone. That was a direct and explicit manifestation of the grant of authority to Wills.

Similarly, the bank reasonably believed Wills had authority to sign the checks in question. While reasonableness in this context "is usually a question for the trier of fact," *id.* § 2.03 cmt. d, the circumstances in this case admit only one possibility: that the bank's belief was reasonable. The bank had a document signed by the firm's sole owner and principal designating Wills as an authorized signer on the account and an agent of the firm. The belief that Wills was thus an authorized signer could be nothing but reasonable, absent suspicious circumstances that would undermine that belief.[12]

to allocate loss between the customer and

someone other than the drawee bank.

Essentially the same analysis applies to the "separate but related question of fact whether such a belief is traceable to a manifestation of the principal." *Id.* A signed document—the gold standard—designating Wills as an authorized signer directly led to the bank's unquestionably reasonable belief that she had authority to do what she did.

Thus, the three "elements" of apparent authority were present. Since Wills had apparent authority to sign the checks, her signatures could not be "unauthorized" under KRS 355.1–201(2)(ao). (Indeed, this is likely why the bank argued to the trial court in its renewed summary-judgment motion that the firm "cannot allege that the Checks were issued with an unauthorized signature.") And, for that reason, KRS 355.4–406 has no applicability to the claims in this case.[13]

**C. Nevertheless, summary judgment in favor of the hank on the UCC claim was appropriate because the firm's claim is barred by the three-year statute of limitations.**

Because KRS 355.4–406 has no application to this case, this Court must resolve the statute-of-limitations question. The trial court found that the firm had failed to file suit within three years of the accrual of its causes of action, as required by KRS 355.4–111.[14] The checks giving rise to the firm's claims were written starting in Sep-

**12.** While such circumstances were eventually present in this case, since the bank came to suspect kiting, they did not arise until after the checks had been signed and deposited, and thus had no effect on the bank's belief during the relevant time period. In fact, at the time, the transactions appeared somewhat normal, since they appeared only to move money from one of the firm's escrow accounts to another.

**13.** Though they have not necessarily engaged in the agency analysis described above, most of the other courts addressing the authorized-unauthorized question, although under different circumstances, have reached similar results. *See Town & Country State Bank of Newport v. First State Bank of St. Paul,* 358 N.W.2d 387, 396 (Minn.1984) ("Town & Country argues that 'fraud can never be authorized' and therefore the check signatures were not authorized. There is no merit to this claim. The checks were signed by Freitag and Donald England, persons authorized to sign checks on behalf of the companies involved. Whatever may have been wrong with the checks, it was not with the signatures."); *Rezapolvi v. First Nat'l Bank of Maryland,* 296 Md. 1, 459 A.2d 183, 190 (1983) ("First, there simply was no unauthorized signature for purposes of the Uniform Commercial Code. Section 1–201(43) states that an ' "[u]nauthorized signature or indorsement" means one made without actual, implied or apparent authority, and includes a forgery.' ... [W]here the authority to sign an instrument was expressly given by a principal to an agent, or implied, or based on apparent authority, the signature was not an unauthorized one under the Uniform Commercial Code. The rule was the same before the adoption of the Code." (citations omitted)); *Quilling v. Nat'l City Bank of Michigan/Illinois,* 99 C 50412, 2001 WL 1516732 (N.D.Ill. Nov. 27, 2001) (unpublished) (holding that checks signed by "an authorized signatory ... have nothing at all to do with any 'unauthorized signatures' "); *cf. Citibank Texas, N.A. v. Progressive Cas. Ins. Co.,* 522 F.3d 591, 596 (5th Cir.2008) (reading "authorized signature or endorsement" in banking agreement to include signature on bank's signature card even though used to fraudulently endorse check). *But see Henrichs v. Peoples Bank,* 26 Kan. App.2d 582, 992 P.2d 1241, 1244 (1999) (holding that UCC § 4–406 applied when thief had been added to signature card and a power of attorney, "the signature card and the power of attorney ... did not authorize the *transactions* at issue" (emphasis added)).

**14.** The bank suggests that the three-year limitation period in KRS 355.3–118(7) also applies. Regardless of which statute controls here, the limitation period is the same, as both require the claim "must be commenced within three (3) years after the claim for relief accrues."

tember 2003 and as late as March 2005.[15] The firm's suit was not filed until January 23, 2009. Thus, at least three years and nine months had passed between the last check and the filing of suit.

The firm argues that summary judgment on this issue was improper because the record presents questions of fact that must be resolved at trial. Implicit in this argument, given the timing of the filing of the complaint, is the claim that some form of the discovery rule applies to the UCC's statute of limitations. The firm also suggests that the bank engaged in fraudulent concealment by not disclosing the suspicious activity to the firm. The bank argues that the firm should have been aware of its claims no later than the time of its receipt of its monthly bank statements, which was far more than three years before the filing of the complaint, and that, regardless of that timing, the discovery rule does not apply under the UCC.

■ Whether the discovery rule applies at all to claims arising under the UCC is a difficult and, in Kentucky, novel question. The discovery rule is available only in limited circumstances, namely, "where the fact of injury or offending instrumentality is not immediately evident or discoverable with the exercise of reasonable diligence, such as in cases of medical malpractice or latent injuries or illnesses." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky.2010). And substantial authority in other jurisdictions suggests that the discovery rule should not apply to the UCC at all when a negotiable instrument, such as a check, is at issue. *See, e.g., Menichini v. Grant*, 995 F.2d 1224, 1229–30 (3d Cir.1993) ("Where a party not engaging in fraudulent concealment asserts the statute of limitations defense, most courts have refused

to apply the discovery rule to negotiable instruments, finding it inimical to UCC policies of finality and negotiability."); *see also New Jersey Lawyers' Fund for Client Protection v. Pace*, 186 N.J. 123, 892 A.2d 661, 662 (2006) ("[T]he time of discovery rule does not apply under the UCC").

■ Though the question in this case has been framed as whether the discovery rule is ever available under the UCC, we need not answer that broad question. Instead, to resolve this case, the Court concludes that the discovery rule is not available to the firm in these circumstances because, despite the firm's assertions to the contrary, it is clear that reasonable diligence would have exposed the kited checks and thus revealed the financial harm.

The firm argues repeatedly that summary judgment was improper because of an alleged factual dispute stemming from Dean's sworn statement that he could not have discovered Wills's fraud without a forensic accountant's assistance. He alleged in an affidavit that "even if [he] had received any bank statements, like the law enforcement officials, [he] would not have been able to decipher fraud without expert intervention." This statement referred to the fact that law enforcement officials, when notified of suspicious activity on the account, resorted to forensic accounting to determine whether fraud had occurred.

But Dean is not in the same position as law enforcement, who are strangers to the account and have only the face of the various documents and instruments to go on in determining the presence of fraud. Unlike law enforcement, Dean (technically, the firm) is the *sole* account holder (as opposed to signatory), making him the

---

**15.** The firm's complaint mentions only the counter, checks, the last of which was written in August 2004, and not preprinted checks. Nevertheless, this Court will use the more conservative date, which the trial court used, of the last activity on the account.

only person with the right to authorize signatures on checks drawn on the account. More importantly, this was not just any bank account but was one of the firm's *escrow* accounts, meaning that Dean, as the lawyer, had a fiduciary duty to manage the account and the funds therein, and to maintain the records related to the account. *See* SCR 3.130–1.15. As the fiduciary over the account, Dean was charged with knowing which checks were properly drawn on his escrow accounts. He also had an ethical duty to oversee his employees and can be held responsible for their conduct. *See* SCR 3.130–5.3.

Unlike law enforcement, Dean had the additional knowledge of what checks were proper and what should have been in the escrow account. And even if he could not be expected to know such information off the top of his head, a simple balancing of the check book and comparison of the monthly statements with his own records should have shown that some of the checks were improper. Indeed, this is why the UCC requires banks to send regular statements to customers and make copies of the checks and other items available for review. (Here, the bank sent the statements *and* copies of all checks on the accounts to the firm. That Wills intercepted the statements does not relieve Dean's duty to properly maintain the records of his accounts.)

This is also why the Rules of Professional Conduct require lawyers to keep "[c]omplete records of such account funds and other property." SCR 3.130–1.15(a). Moreover, the lawyer must keep books and records "on a *current* basis ... in accordance with generally accepted accounting practice." SCR 3.130–1.15(a) Supreme Court Commentary (1) (2009) (emphasis added). At the very least, then, Dean had constructive knowledge of the state of his

accounts because he, as a fiduciary, should have known what was going on with them.

Dean nonetheless argues that the question is whether he could have *reasonably* discovered the kited checks or whether he exercised *reasonable* diligence, and that reasonableness is always a factual question for the jury. This, he claims, bars summary judgment.

■■■■ While reasonableness, like all factual questions, is ordinarily determined by the finder of fact, merely raising the question is not by itself sufficient to present it to the fact finder. The reasonableness of an act or omission is required to go to the jury only where there is a "factual dispute regarding the reasonable[ness]." *R.T. Vanderbilt Co., Inc. v. Franklin,* 290 S.W.3d 654, 659 (Ky.App.2009). But if "reasonable minds cannot differ," then the matter need not be submitted to a jury. *Shelton v. Kentucky Easter Seals Soc'y, Inc.,* 413 S.W.3d 901, 916 (Ky.2013).

The firm also argues that the bank had a duty to report the suspicious activity on the account to the firm and suggests that the failure to do so constituted fraudulent concealment. (In fact, one of the firm's claims is that the bank aided and abetted Wills's fraud.) The firm cites the bank's internal policies and federal law requiring the filing of a Suspicious Activity Report to support this argument. While the policies and federal law do require the filing of such reports, nothing in them suggests a duty to report this matter to the customer. Indeed, as the bank points out (and the firm fails to address), federal law prohibits the disclosure of such reports to the bank customer. *See* 31 U.S.C. § 5318(g)(2)(A) (stating no bank or bank employee "may notify any person involved in the transaction that the transaction has been reported"); 31 C.F.R. § 1020.320(e)(1) (barring bank and bank employees from disclosing suspicious activity report or "any informa-

tion that would reveal the existence of a SAR" even in response to a subpoena).[16] This makes sense, because the suspicious activity to be reported is usually that of the account holder thought to be engaged in check-kiting or other illegal activity.

The firm further suggests that the answers of several deposed employees stating they had not filed suspicious activity reports prove that no such report was filed (or was filed late), which in turn means that the bank failed to comply with its duties to report such matters to federal law enforcement, such as the Financial Crimes Enforcement Network (FinCEN) and the FBI. This, the argument goes, delayed investigation by law enforcement, who would have otherwise notified the firm sooner. First, as noted above, those employees were barred from disclosing the existence of any suspicious activity reports, and thus could not answer the question directly. Of course, that they failed to cite 31 C.F.R. § 1020.320(e)(1) and 31 U.S.C. 5318(g)(2)(A)(i) in their answers, as required by the regulation, suggests that they did not file a report. Second, that an individual employee did not file a suspicious activity report does not mean that no other employee filed such a report; and it appears that the FBI, which eventually investigated the suspected kiting, was notified somehow. Third, this claim is purely speculative. Since the firm or Dean would have been the target of any investigation, it is likely that law enforcement would *not* have notified them early on because law enforcement is also barred from disclosing a suspicious activity report or "any information that would reveal the existence of a [report], except as necessary to fulfill official duties." 31 C.F.R. § 1020.320(e)(2).

Additionally, the firm notes one of the bank's employees testified that suspicious activity could not be established from the statements alone, suggesting that the injury could only have been known if the bank disclosed it to the firm directly. But as the bank notes, the employee testified that kiting could only be confirmed by looking at the records of both banks—which the firm, as account holder, had access to. Again, the firm was in the unique position of having superior information about statements for both accounts and knowledge of what items should have been drawn on them. The bank disclosed more than enough information for the firm to identify a problem with its account.

It is especially odd that Dean would claim that there is a factual question as to whether he could have "reasonably" discovered the fraud given the type of account at issue. This was not a run-of-the-mill petty cash account over which a non-lawyer subordinate could readily be trusted with a free rein. This account was Dean's *escrow* account, over which he was required to act as a fiduciary. Dean had a legal duty, under both the Rules of Professional Conduct and the UCC, to examine his bank statements, to maintain proper records of those accounts, and, in short, to act "with the care required of a professional fiduciary." SCR 3.130–1.15 Supreme Court Commentary (1) (2009). He cannot stand before the courts and claim that he would not have seen fraud even if he had looked. He had a duty to be diligent and to discover the fraud, which he did not do.

The simple fact is that the fraud in this case was "discoverable with the exercise of reasonable diligence." *Fluke Corp. v. Le-Master,* 306 S.W.3d 55, 60 (Ky.2010). In fact, "employers generally have a compar-

---

**16.** The banks cites 31 C.F.R § 103.18(e) as the proper regulation. That regulation, however, was moved in 2011, *See* Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed.Reg. 65806–01 (Oct. 26, 2010) (making transfer effective March 1, 2011).

ative advantage over financial institutions to prevent diversion of company funds by their own employees." *Euro Motors, Inc. v. Sw. Fin. Bank & Trust Co.,* 297 Ill. App.3d 246, 231 Ill.Dec. 415, 696 N.E.2d 711, 715 (1998). This comparative advantage is recognized in KRS 355.4–406, which places a duty on bank customers to review their statements for unauthorized signatures. Complying with that duty should turn up other instances of fraud. *Cf. Am. Airlines Emp. Fed. Credit Union v. Martin,* 29 S.W.3d 86, 92 (Tex.2000) ("Because the customer ... should know whether or not he authorized a particular withdrawal or check, he can prevent further unauthorized activity better than a financial institution, which may process thousands of transactions in a single day.").

Because Dean failed to even look into the matter, having apparently not looked at the bank statements for more than a year, it is unquestionable that he did not exercise reasonable diligence. Had he simply compared his own records of items that should have been drawn on the escrow account with the bank statements, he would have seen numerous suspicious items. Instead, he relied on an employee to review the statements, and entrusted that employee with surprisingly broad control over the escrow account.[17] The employee then abused that trust. That is not reasonable diligence.

Thus, the discovery rule is not available in this case to salvage the firm's UCC claim. And because the UCC claim was filed more than three years after it accrued, it is barred by the statute of limitations.

### D. The firm's common-law claims are also barred.

■ The remaining question is whether the firm's common-law claims are subsumed by the UCC and are thus barred by the UCC's statute of limitations. As the bank points out, there is a strong policy in favor of treating the UCC as occupying the field and displacing common-law causes of action. Indeed, this Court has stated "that the Code is plenary and exclusive except where the legislature has clearly indicated otherwise." *Lincoln Bank & Trust Co. v. Queenan,* 344 S.W.2d 383, 385 (Ky.1961).

And there is no question that the UCC is intended to be "liberally administered." KRS 355.1–305(1). This has led many commentators to conclude that the UCC, as a comprehensive code of law (rather than a single statute or series of related statutes), should be read broadly to preempt common-law and other non-code causes of action. *See, e.g.,* 1 William D. Hawkland et al., *Hawkland's Uniform Commercial Code Series* § 1–103:12 [Rev.] (rev.2013) ("[C]urrently the paramount rule is one of preemption by the Code of non-Code law, and that preemption extends to the displacement of any law that is inconsistent with the Code's express terms, or its purposes and policies; that is, supplementation no longer stands on an equal footing with Code purposes and policies but rather is one of several considerations to be balanced rather than separately accommodated.").

But the UCC "neither has, nor does it purport to have, all the answers." David J. Leibson & Richard H. Nowka, *The Uniform Commercial Code of Kentucky* § 1.03, at 1–4 (3d ed.2004); *see also C–Wood Lumber Co., Inc. v. Wayne Cnty. Bank,* 233 S.W.3d 263, 281 (Tenn.Ct.App.

---

**17.** It is especially concerning, given the duty of a lawyer to supervise his employees, that Dean allowed a non-lawyer direct access to an escrow account on her own signature alone.

2007) ("While this scheme is not comprehensive, it is nearly so."). The "plenary" statement in *Lincoln Bank* simply went too far. Indeed, the UCC itself admits this, leaving some room for the common law: "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity ... supplement its provisions." KRS 355.1–103(2).

The drafters of the UCC described the interplay of the Code and the common law as one of both supplementation and preemption:

> [T]he Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may supplement provisions of the Uniform Commercial Code, they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies. The language of subsection (b) is intended to reflect both the concept of supplementation and the concept of preemption.

U.C.C. § 1–103 Official Cmt. 2 (2002).

"The question of whether the UCC has displaced other principles of law and equity in a given situation is one that must be decided in each case." Leibson & Nowka, *supra*, § 1.03, at 1–4. The proper balance tends to favor application of the UCC and displacement of other law. "Since the Code was promulgated to lend as much stability and certainty to commercial law as possible, it should be applied whenever possible." *Id.* Thus, "the prevailing view now is that when the UCC provides a comprehensive remedy for the parties to a transaction, common-law and other non-Code claims and remedies should be barred." *C–Wood Lumber*, 233 S.W.3d at 281. As a result, "courts dealing with 'hard cases' should be hesitant to recognize common-law or non-U.C.C. claims or to employ common-law or non-UCC remedies in the mistaken belief that they are dealing with one of the rare transactions not covered by the UCC." *Id.*

This is one of those hard cases, since it presents facts bordering on the unique. Indeed, this Court has been unable to find another case addressing precisely the same facts (though the few addressing facts even remotely close to these have been decided in favor of the bank).

■ Displacement of common law does not require an explicit statement to that effect each time it occurs. *See Burtman v. Technical Chems. & Prods., Inc.*, 724 So.2d 672, 676 (Fla.Dist.Ct.App.1999). Instead, the UCC "should also be understood to intend the displacement of the common law whenever both the code and the common law would provide a means of recovery for the same loss." *Clancy Sys. Int'l, Inc. v. Salazar*, 177 P.3d 1235, 1237 (Colo. 2008).

■ A majority of jurisdictions decide UCC-displacement questions with the "comprehensive rights and remedies test." Melissa Waite, Note, *Check Fraud and the Common Law: At the Intersection of Negligence and the Uniform Commercial Code*, 54 B.C.L.Rev. 2205, 2228 (2013). Under that rule, "where the Code provides a comprehensive remedy for the parties to a transaction, a common law action will be

barred." *Sebastian v. D & S Exp., Inc.,* 61 F.Supp.2d 386, 391 (D.N.J.1999).

This Court concludes that with respect to the transactions at issue, the UCC provides a comprehensive remedy, or scheme of remedies. The list of scenarios directly covered by Articles 3 and 4 is long, and includes instances where a bank pays a check written by an imposter or to a fictitious payee, KRS 355.3–404 (allocating loss to the person failing to exercise ordinary care); pays on a forged signature or altered instrument, KRS 355.3–406 (allocating loss to person(s) failing to exercise ordinary care); and pays on an employee's fraudulent endorsement, KRS 355.3–305 (allocating loss to bank that fails to exercise ordinary care). Article 3 also allocates loss based on various warranties, KRS 355.3–415 to 3.416, and when payment is made by mistake, KRS 355.3–418. Article 4 also allocates losses among banks dealing with checks that are returned, KRS 355.4–202 (midnight deadline); the bank's liability to its customer for wrongful dishonor, KRS 355.4–402; and the liability between the bank and the customer for payment on unauthorized signature or altered instrument, KRS 355.4–406. While this listing is far from complete, the Articles 3 and 4 system of remedies itself is intended to be "a comprehensive allocation scheme for check fraud losses." A. Brooke Overby, *Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4,* 57 Ala. L.Rev. 351, 398 (2005).

Perhaps the one scenario that is not directly addressed by Articles 3 and 4 is when an employee who is not an account holder but is nonetheless authorized to sign checks by herself does exactly that— and deposits them in another account of the account holder at another bank. That is because nothing in those facts could give rise to liability for the bank paying the checks Indeed, the firm does not even have a claim for conversion, since it is technically the drawer and issuer of the check. *See* KRS 355.3–420(1)(a). Instead, the firm, as drawer, "has an adequate remedy against the payor bank for recredit of the drawer's account for *unauthorized* payment of the check." U.C.C. § 3–420 Official Cmt. 1 (2002).

Of course, the recredit remedy for an unauthorized payment, that is, one based on an unauthorized signature, is through KRS 355.4–406 and related statutes. But, as discussed above, the bank did not pay checks with unauthorized signatures. Thus, KRS 355.4–406 cannot be a basis for liability.

■ At best, the firm's remedy lies in "the law relating to the presentment and payment of a depositor's checks," which "is equally applicable to claims for wrongful disbursement of funds belonging to a depositor." *Honeycutt v. Honeycutt,* 150 Md.App. 604, 822 A.2d 551, 560 n. 6 (Md. Ct.Spec.App.2003). But again, the firm cannot assert a claim under that law because the checks were "properly payable." KRS 355.3–401(1) ("A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft.").

A check "is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." *Id.* There is no question that the checks were paid in accordance with the agreement with the bank. And Wills's status as an apparent agent means that the checks were "authorized." Under KRS 355.3–401, a person can be liable on a negotiable instrument, including a check, if the person signs it or "[t]he person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under KRS 355.3–

402." KRS 355.3–401(1)(b). A signature is binding under KRS 355.3–402(1) if it would be binding on a simple contract. An agent's apparent authority is sufficient to bind the principal with respect to third parties, like the bank. *See Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 594 (Ky. 2012) ("The principal will then be bound by such a transaction [by an apparent agent] even if the agent was not actually authorized to enter it."). Because Wills had apparent authority to sign the checks, her action was binding on the firm with respect to the bank, making the checks properly payable.

How can the bank be held liable for having paid a properly payable item? The simple answer is that it cannot.

While Wills engaged in fraud, she did not do so by means of altering the checks, forging a signature, or fraudulently endorsing checks payable to the firm. Instead, she committed the fraud by abusing the (apparent) authority given to her by the firm. Any failure to stop that fraud was not the bank's. *Cf. Honeycutt*, 822 A.2d at 558–59, 558 n. 6 (holding bank not liable for authorized signatory's withdrawal of money from account and concluding that "Bank's actions were commercially reasonable because her signature was expressly authorized"); *Atlanta Sand & Supply Co. v. Citizens Bank*, 276 Ga.App. 149, 622 S.E.2d 484, 487 (2005) (holding that bank "is not liable for any abuse of [agent's] authority" when she had been authorized to do so and bank had her listed as an authorized signatory).

If anything, the firm's claims are against Wills, who acted beyond her actual authority as the firm's agent. *See Restatement (Third) of Agency* § 8.09 cmt. b (2006) ("If an agent takes action beyond the scope of the agent's actual authority, the agent is subject to liability to the principal for loss caused the principal."). She has already been ordered to pay restitution, and a civil judgment based on the restitution order has been entered against her. *See Wills v. Commonwealth*, 396 S.W.3d 319, 320, 321 (Ky.App.2013).

Moreover, the firm does not appear to have suffered a loss from the account at Commonwealth Bank. The checks in question—those drawn on the Commonwealth Bank account with Wills's signature—were deposited in the firm's account at the other bank. In other words, at least as it regards Commonwealth Bank, all that happened was that Wills moved money from one of the firm's accounts to another of the firm's accounts.[18] That means the firm retained control over the money after Commonwealth Bank acted. While check-kiting is illegal, "constitut[ing] bank fraud" under 18 U.S.C. § 1344, A. Brooke Overby, *Allocation of Check Kiting Losses Under the UCC, Regulation CC, and the Bankruptcy Code: Reconciling the Standards*, 44 Wake Forest L.Rev. 59, 106 n. 17 (2009), the mere movement of money between accounts did not create losses for the firm. Rather, any theft affecting the firm had to have been accomplished by some additional step, such as a cash withdrawal from the Citizens Union Bank account where the checks at the heart of this case were deposited.

As far as this Court can discern from the record, the money was diverted *after*

---

18. In its initial demand letter to the bank, complaint, and brief to this Court, the firm claims that Wills diverted the funds to her own use by writing the checks in question, suggesting that she took money directly from the Citizens Union account for her own use. But the proof present in the record, specifically the testimony of Belinda Nichols and copies of the checks (including the back of the checks), shows that the checks drawn on Commonwealth Bank were deposited in the Citizens Union Bank account.

the transfers from Commonwealth Bank to Citizen's Union. And the draws on the Commonwealth Bank account appear to have been preceded by deposits of checks drawn on the Citizen's Union account (and thus the kite). Nothing brought to this Court's attention, aside from the firm's conclusory assertions, suggests that Wills stole money from the Commonwealth Bank account, which suggests an intervening cause of any loss.

Banks are usually regarded as the victims of check-kiting schemes, as they tend to suffer the losses, not the account holders. *Id.* at 106. In fact, it is usually the account holders who perpetuate the check-kiting scheme. (This case is unusual in that a non-account holder was allowed unfettered access to the account by the account holder, which gave her the opportunity to kite checks.) And lawyers and law firms whose employees are authorized signatories on escrow accounts are commonly held liable to the injured bank, rather than the bank owing the lawyers and law firms. *See, e.g., Bank of America NT & SA v. Hubert,* 153 Wash.2d 102, 101 P.3d 409, 418 (2004) (affirming bank's withdrawal of credit to firm's escrow account after account-signatory paralegal kited checks); *In re Gibbes,* 315 S.C. 186, 432 S.E.2d 482 (S.C.1993) (finding lawyer responsible for failure "to adequately oversee the day-to-day operations of his firm and ... to adequately supervise his employees," finding fault because lawyer "maintained too many financial accounts on which several employees had signatory authority; and, therefore, lost the ability to maintain the integrity of the funds therein," and ordering lawyer to pay restitution to bank). Presumably, the injured bank here is Citizens Union Bank, which has never been a party to this case.

The firm's complaint, however, is cleverly pleaded, asserting that the bank alternately was negligent, aided and abetted (negligently? intentionally?), and was in breach of contract, and generically that the bank's actions allowed diversion of the funds. This has obfuscated what should otherwise be obvious: that when an employer authorizes an employee to write checks on its account and tells the bank that the employee is so authorized, the bank does not act wrongly by paying checks written by the employee. And even if some modicum of wrongful conduct could be discerned there, it is alleviated, completely, by the fact that the supposedly wrongful checks were written to the employer and deposited in one of the employer's other accounts at another bank. The money left the bank and went to another bank, where it was still under the firm's control, if only temporarily before Wills extracted it. The UCC does not expressly lay out a remedy for allocating loss in such a scenario because it is not needed.

If anything, the UCC implicitly allocates the loss to the account-holding employer in circumstances like these by binding an account holder by the acts of an apparent agent and by allowing the bank to pay properly payable items. Under either of these approaches (and both are present), the check in question is binding.

That the checks were properly payable is further supported by KRS 355.4–401(2), which states that "[a] customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefited from the proceeds of the item." This provision is intended to address a scenario like this one where "there is more than one customer who can draw on an account." U.C.C. § 4–401 Official Comment 2 (2002). In such a situation, "the nonsigning customer is not liable for an overdraft unless that person benefits from the proceeds of the item." *Id.* Thus, had the checks in this case resulted in an over-

draft, the firm (more specifically, Dean) would not be responsible, because Dean had not signed the checks. But there was no overdraft here. The exclusion of non-overdraft scenarios from the statute suggests that the firm is liable when there are sufficient funds in the account to cover the checks.

The firm was bound by Wills's apparent authority and the checks were properly payable. Thus, the checks were properly charged to the firm's account Indeed, if the bank had dishonored the checks, it could face liability for wrongful dishonor. *See* KRS 355.4–402.

The simple fact is that Dean (as owner of the firm) was in the best position to stop or alleviate any loss. His knowledge, constructive or actual, of the checks properly written on his various escrow accounts put him in a better position than the bank, or even law enforcement, to discover Wills's fraud. While the fraud was sophisticated, in that it did not depend on forgery or alteration and instead operated on an abuse of Dean's trust, one of the primary thrusts of Article 4 is to require customers to look out for their own accounts. When everything appears proper from the bank's perspective, it cannot be held liable until, for whatever reason, it has reason to believe that fraud is occurring. Commonwealth Bank did eventually begin to suspect fraud, and it claims to have brought the fraud to the firm's attention. But there is no allegation or even suggestion that the bank paid checks after that point in time.

While it is questionable whether the firm even had a cause of action here, this Court is satisfied that the circumstances of this case are governed by the UCC's Articles 3 and 4, which provide a comprehensive scheme of remedies for check fraud. Thus, all the firm's claims, which were brought more than three years after their accrual, are barred by the UCC's statute of limitations, as discussed in the preceding section of this opinion.

### III. Conclusion

For the foregoing reasons, the judgment of the Court of Appeals is affirmed and the circuit court's grant of summary judgment stands.

All sitting. All concur.

