RENDERED:  NOVEMBER 12, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0478-MR

MGG INVESTMENT GROUP LP                                    APPELLANT

|  | APPEAL FROM FAYETTE CIRCUIT COURT |
|---|---|
| v. | HONORABLE KIMBERLY N. BUNNELL, JUDGE |
|  | ACTION NO. 20-CI-00248 |

MULL ENTERPRISES LIMITED
D/B/A YEOMANSTOWN STUD                                     APPELLEE

AND                              NO. 2020-CA-0434-MR

MULL ENTERPRISES LIMITED                          CROSS-APPELLANT
D/B/A YEOMANSTOWN STUD

|  | CROSS-APPEAL FROM FAYETTE CIRCUIT COURT |
|---|---|
| v. | HONORABLE KIMBERLY N. BUNNELL, JUDGE |
|  | ACTION NO. 20-CI-00248 |

MGG INVESTMENT GROUP LP                              CROSS-APPELLEE

AND                              NO. 2020-CA-0821-MR


MGG INVESTMENT GROUP LP                              APPELLANT



APPEAL FROM FAYETTE CIRCUIT COURT
v.       HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 20-CI-00248



HILL 'N' DALE EQUINE HOLDINGS, INC.;
LNJ FOXWOODS, LLC; MCMAHON OF
SARATOGA THOROUGHBREDS, LLC; AND
ORPENDALE UNLIMITED COMPANY                              APPELLEES



AND                              NO. 2020-CA-0900-MR



MGG INVESTMENT GROUP LP                              APPELLANT



APPEAL FROM FAYETTE CIRCUIT COURT
v.       HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 20-CI-00248



BEMAK N.V., LTD.                              APPELLEE



AND                              NO. 2020-CA-0960-MR



MGG INVESTMENT GROUP LP                              APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT

v.          HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 20-CI-00248


FLINTSHIRE FARM, LLC AND THOMAS
B. SEARS A/K/A BRAD SEARS                    APPELLEES


OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE:  ACREE, GOODWINE, AND JONES, JUDGES.

GOODWINE, JUDGE:  MGG Investment Group LP ("MGG") appeals the

judgment of the Fayette Circuit Court dismissing its claims against Mull

Enterprises Limited d/b/a Yeomanstown Stud ("Yeomanstown") based on KRS[1]

413.242.  Yeomanstown cross-appeals the circuit court's determination that MGG

may be entitled to equitable tolling in dismissing its claims without prejudice.

MGG also appeals judgments of the Fayette Circuit Court dismissing

its claims against Hill 'N' Dale Equine Holdings, Inc. ("Hill 'N' Dale"); LNJ

Foxwoods, LLC ("Foxwoods"); McMahon of Saratoga Thoroughbreds, LLC

("McMahon"); Orpendale Unlimited Company ("Orpendale"); Flintshire Farm,

---

[1] Kentucky Revised Statutes.

-3-

LLC ("Flintshire"); and Thomas B. Sears a/k/a Brad Sears ("Sears") under CR[2]

12.02(f) and granting summary judgment on behalf of Bemak N.V., Ltd.

("Bemak"). After careful review of the record and applicable law, and

consideration of oral arguments by the parties, we affirm in part, reverse in part,

and remand for entry of a judgment dismissing MGG's claims against

Yeomanstown with prejudice.

## BACKGROUND

Zayat Stables, LLC ("Zayat Stables") is in the business of "[o]wning,

raising, maintaining, buying, selling, racing, breeding and promoting horses."

Record ("R.") at 867. The most well-known of Zayat Stables' thoroughbreds is

AMERICAN PHAROAH, winner of the 2015 Triple Crown.

> In 2016, MGG loaned Zayat Stables $30 million secured by
>
> all of the property and assets and all interests therein and
> proceeds thereof now owned or hereafter acquired by any
> Person upon which a Lien is granted or purported to be
> granted by such Person as security for all or any part of
> the Obligations, including, without limitation, all Equine
> Collateral.

R. at 748. The financing agreement defines "Equine Collateral" as

> all horses, stallions, mares, weanlings, foals,
> thoroughbred bloodstock and/or stallion shares, breeding
> rights, lifetime breeding rights and/or fractional interests
> therein, their offspring and young, both born and unborn,
> and/or fractional interests therein, stallion seasons and

---

[2] Kentucky Rules of Civil Procedure.

shares, and any other interests in any of the foregoing, owned by [Zayat Stables] or any of its Subsidiaries, howsoever classified, whether now owned or hereafter acquired, and including all substitutions and replacements thereof.

*Id*. at 752. Under the financing agreement, Zayat Stables was obligated to report to MGG any sale of equine collateral. *Id*. at 809. Zayat Stables agreed not to sell any equine collateral except as permitted by the agreement. *Id*. at 819. The agreement allowed, in part, for sales which were for fair market value and in the ordinary course of business. *Id*. at 765. Upon any sale, Zayat Stables was required to prepay principal with a percentage of the proceeds. *Id*. at 784.

These appeals involve sales of ownership interests in EL KABEIR, AMERICAN CLEOPATRA, and SOLOMINI, three horses owned by Zayat Stables at the time the financing agreement was executed, as well as the sale of the breeding rights to AMERICAN PHAROAH and LEMOONA. On September 20, 2017, Zayat Stables privately sold EL KABEIR to Yeomanstown for $500,000. On November 15, 2017, Zayat Stables privately sold AMERICAN CLEOPATRA to Hill 'N' Dale for $1.3 million. Between December 2018 and June 2019, Zayat Stables sold nine shares of the breeding rights to AMERICAN PHAROAH to Foxwoods and Orpendale for a total of $3.3 million. On March 6, 2019, Zayat Stables privately sold the breeding rights to LEMOONA to Flintshire and Sears for $150,000. On December 3, 2019, Zayat Stables privately sold its fifty percent

ownership interest in SOLOMINI to McMahon.[3]  MGG claims none of these sales

were for fair market value and that Zayat Stables did not prepay principal upon

receiving the proceeds from the sales in violation of the financing agreement.

In September 2019, Zayat Stables defaulted on the loan.

Subsequently, MGG sent Zayat Stables a notice of default and reservation of

rights.  On January 21, 2020, after failing to reach an agreement for liquidation,

MGG filed suit against Zayat Stables alleging breach of contract and fraud.  R. at

1043-46.  MGG's claims against Zayat Stables remain pending before the circuit

court.

On February 11, 2020, MGG amended its complaint to include claims

against purchasers of equine collateral, including the appellees.  In relevant part,

MGG claimed intentional interference with contract against Orpendale, replevin

and constructive trust against Yeomanstown, Hill 'N' Dale, Foxwoods, Orpendale,

and McMahon, as well as unjust enrichment against Flintshire and Sears.[4]  MGG

claimed Bemak tortiously interfered with its security interest when Bemak

facilitated Orpendale's purchase of AMERICAN PHAROAH breeding rights.

---

[3] Zayat Stables previously sold a fifty percent interest in SOLOMINI to Orpendale for $800,000.
Prior to the sale to Orpendale, Zayat Stables obtained a partial release from MGG and, after the
sale, transferred proceeds to MGG in accordance with the financing agreement.  R. at 1031-37.
McMahon contemporaneously purchased Orpendale's ownership interest.

[4] MGG also amended its complaint to include claims against individual members of the Zayat
family.  These individuals are not parties to these appeals.

Yeomanstown moved to dismiss MGG's claims based on the statutes of limitations under KRS 413.242 and KRS 413.125. The circuit court granted the motion, holding KRS 413.242 and KRS 413.125 are applicable and the discovery rule is inapplicable herein. However, in dismissing MGG's claims against Yeomanstown without prejudice, the court also determined MGG may be entitled to equitable tolling.

The remaining appellees moved for summary judgment and dismissal of MGG's claims. In granting the motions, the circuit court determined the Food Security Act of 1985 ("FSA") applied to these sales because horses and breeding rights are "farm products" under 7 U.S.C.[5] § 1631(c)(5). R. at 2560.[6] The court further determined, based upon MGG's own description of Zayat's business, appellees were buyers "in the ordinary course of business" who took the horses or breeding rights free of MGG's security interest. R. at 2560-61.

These appeals and cross-appeal followed.

---

[5] United States Code.

[6] This citation is to the order dismissing MGG's claims against McMahon. The court's reasoning in dismissing the claims against Foxwoods, Orpendale, Hill 'N' Dale, Flintshire, and Sears, as well as granting summary judgment in favor of Bemak, is essentially identical to its reasoning in the McMahon order.

## STANDARD OF REVIEW

A motion to dismiss under CR 12.02(f) for failure to state a claim upon which relief may be granted is reviewed *de novo*. *Carruthers v. Edwards*, 395 S.W.3d 488, 491 (Ky. App. 2012) (citation omitted).

> The court should not grant the motion unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim. In making this decision, the circuit court is not required to make any factual determination; rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?

*James v. Wilson*, 95 S.W.3d 875, 883-84 (Ky. App. 2002) (internal quotation marks and footnotes omitted).

Summary judgment is also reviewed *de novo*. *Isaacs v. Sentinal Insurance Company Limited*, 607 S.W.3d 678, 681 (Ky. 2020) (citation omitted). In determining whether summary judgment was proper, we must determine "whether the circuit [court] correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law. Summary judgment is appropriate where the movant shows that the adverse party could not prevail under any circumstances." *Id.* (citation omitted).

## ANALYSIS

On appeal, MGG argues: (1) the circuit court erred in granting summary judgment and dismissing its claims based on the FSA; (2) KRS 413.242

-8-

does not bar its claims against Yeomanstown; and (3) MGG is entitled to application of the discovery rule and/or equitable tolling, making its claims against Yeomanstown timely under KRS 413.125. On cross-appeal, Yeomanstown argues, because MGG is not entitled to equitable tolling, its claims should have been dismissed with prejudice.[7]

First, MGG alleges the circuit court erred in determining the FSA allowed the appellees to take horses and breeding rights free of MGG's security interest. Within this argument, MGG claims: (1) thoroughbred race horses and breeding rights thereto are not "farm products" under the FSA; (2) the appellees are not "buyers in the ordinary course" under the statute; and (3) the AMERICAN PHAROAH breeding rights were not sold by the same party which created the security interest therein.

Prior to passage of the FSA in 1985, many states enacted "farm products exceptions" under the Uniform Commercial Code ("UCC") to protect security interests in farm products. Kentucky's farm products exception mirrors those of other states and mandates

> [e]xcept as otherwise provided in subsection (5) of this section, a buyer in ordinary course of business, *other than a person buying farm products from a person engaged in farming operations*, takes free of a security

---

[7] At oral arguments, Hill 'N' Dale joined Yeomanstown in this argument. Although Hill 'N' Dale argued MGG's claims were time barred by KRS 413.125, the circuit court did not reach this argument because it found application of the FSA dispositive of the claims against Hill 'N' Dale.

> interest created by the buyer's seller, even if the security
> interest is perfected and the buyer knows of its existence.

KRS 355.9-320(1) (emphasis added).

Congress adopted the FSA to eliminate these exceptions and protect purchasers of farm products from "double payment." 7 U.S.C. § 1631(a)(2). The FSA requires

> [e]xcept as provided in subsection (e) and
> notwithstanding any other provision of Federal, State, or
> local law, a buyer who in the ordinary course of business
> buys a farm product from a seller engaged in farming
> operations shall take free of a security interest created by
> the seller, even though the security interest is perfected;
> and the buyer knows of the existence of such interest.

7 U.S.C. § 1631(d).[8]

MGG argues Kentucky's farm products exception is not entirely preempted by the FSA because the General Assembly, by amending the UCC definition of farm products, specifically included "[e]quine interests, including, but not limited to, interests in horses, mares, yearlings, foals, weanlings, stallions, syndicated stallions, and stallion shares (including seasons and other rights in

---

[8] Subsection (e) delineates the manner by which a buyer takes the farm product subject to a security interest created by the seller. For farm products to sell subject to a security interest, the buyer must either receive direct notice or, where applicable, appropriate filings must be made through a central filing system. Kentucky has not implemented a central filing system, making direct notice to the buyer necessary to protect a security interest created by a seller.

connection therewith), whether or not the debtor is engaged in farming operations and without regard to the use thereof." KRS 355.9-102(1)(ah)5.

"Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. National Solid Waste Management Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383, 120 L. Ed. 2d 73 (1992) (internal quotation marks and citations omitted). The FSA expressly preempts state farm products exceptions through inclusion of "notwithstanding any other provision of Federal, State, or local law" within the language of the statute. *Farm Credit Bank of St. Paul v. F & A Dairy*, 477 N.W.2d 357, 360 (Wis. Ct. App. 1991). This is reinforced by Congress' statements of intention in enacting the FSA, as recorded in a House Committee Report.

> The bill is intended to preempt state law (specifically the so-called "farm products exception" of the Uniform Commercial Code section 9-307) to the extent necessary to achieve the goals of this legislation. Thus, this Act would preempt state laws that set as conditions for buyer protection of the type provided by the bill requirements that the buyer check public records, obtain no-lien certificates from the farm products sellers, or otherwise seek out the lender and account to that lender for the sale proceeds.

*Food Services of America v. Royal Heights, Inc.*, 871 P.2d 590, 595 (Wash. 1994) (*en banc*) (citing H. R. REP.[9] No. 271, pt. 1, 99th Cong., 1st Sess. 110 (1985), *reprinted in* U.S.C.C.A.N.[10] 1103, 1214).  Based upon this reasoning, Kentucky's farm products exception is preempted by the FSA.

MGG further argues neither thoroughbred race horses nor breeding rights qualify as "farm products" under the FSA.  The FSA defines a "farm product" as

> an agricultural commodity such as wheat, corn, soybeans, or a species of livestock such as cattle, hogs, sheep, horses, or poultry used or produced in farming operations, or a product of such crop or livestock in its unmanufactured state (such as ginned cotton, wool-clip, maple syrup, milk, and eggs), that is in the possession of a person engaged in farming operations.

7 U.S.C. § 1631(c)(5).

When interpreting a statute, we must first consider the plain language of the law and, where there is no ambiguity, we will look no further.  *Seeger v. Lanham*, 542 S.W.3d 286, 291 (Ky. 2018) (citation omitted).  Where no ambiguity exists, "there is no need to resort to the rules of statutory construction in interpreting it.  The words of the statute are simply accorded their commonly understood meaning."  *Id.* at 293 (citation omitted).

---

[9] House of Representative Reports.

[10] United States Code Congressional and Administrative News.

-12-

Herein, farm products are plainly defined to include horses. MGG attempts to distinguish thoroughbreds from workhorses, claiming only the latter can be considered farm products. However, Congress did not provide such a distinction. Although addressing another clause of the FSA, a United States District Court accurately described the place of statutory construction when it stated,

> [i]t is apparent that Congress intended by the FSA to shift the potential burden of loss in cases of the sale of farm products to the lenders who finance farm operations, rather than have that burden imposed upon buyers, thus inhibiting interstate commerce. If Congress has cast its net too broadly in the FSA, at least in some circumstances, the proper remedy is in legislative amendment, not strained construction by the judiciary.

*Lisco State Bank v. McCombs Ranches, Inc.*, 752 F.Supp. 329, 334 (D. Neb. 1990).

In defining farm products, Congress only qualified that the horse must be "used or produced in farming operations[.]" 7 U.S.C. § 1631(c)(5). "Farming operations" are not defined by the FSA. However, Kentucky's UCC defines "farming operation[s]" to include "raising, cultivating, propagating, fattening, grazing, or any other farming, livestock, or agricultural operation[.]" KRS 355.9-102(1)(ai). Additionally, BLACK'S LAW DICTIONARY (11th ed. 2019), borrows from the federal bankruptcy statute in defining "farming operation[s]" as "[a] business engaged in farming, tillage of soil, dairy farming, ranching, raising of crops, poultry, or livestock, or production of poultry or livestock products in an

-13-

unmanufactured state." *See also* 11 U.S.C. § 101(21). MGG cites to no alternative definition for farming operations which does not include raising livestock, including horses.

Certainly, there are owners of thoroughbred race horses who are not engaged in farming operations. However, Zayat Stables is not such an owner. In fact, in its amended complaint and the financing agreement, MGG defines the nature of Zayat Stables' business as "[o]wning, *raising*, maintaining, buying, selling, racing, breeding and promoting horses." R. at 867. Because Zayat Stables raises horses, it is engaged in farming operations. Furthermore, because the horses in question were sold by a business engaged in such operations, they are farm products.

Following similar reasoning, the AMERICAN PHAROAH breeding rights are also farm products. Again, MGG attempts to narrow the definition of farm products in a manner which Congress did not in enacting the FSA. This Court, in a decision which predates enactment of the FSA, determined a stallion syndicate granting one free nomination per breeding season of a mare to be bred to the stallion for its lifetime is properly classified as a farm product. *North Ridge Farms, Inc. v. Trimble*, 1983 WL 160534, 37 UCC Rep. Serv. 1280, 1288 (Ky.

App. Dec. 2, 1983).[11]  Similarly, we are persuaded that lifetime breeding rights in AMERICAN PHAROAH are farm products under the FSA.

MGG next argues the FSA does not apply to the subject sales because the appellees are not buyers in the ordinary course of business.  7 U.S.C. § 1631(d).  A buyer in the ordinary course of business is defined as "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products."  7 U.S.C. § 1631(c)(1).  MGG's argument must fail because, as discussed previously, within the amended complaint and security agreement, MGG defines Zayat Stables' business to include the selling of horses.  R. at 867.  We cannot overlook this admission.

With regard to the AMERICAN PHAROAH breeding rights, MGG further argues the security interest in the rights was not created by the seller of the rights, making the FSA inapplicable.  MGG claims Justin Zayat, individually and separately from Zayat Stables, sold the breeding rights.  Much like its prior argument, MGG ignores its own amended complaint in making this assertion.  Specifically, within the amended complaint, MGG asserts "Zayat Stables and the

---

[11] We cite this unpublished opinion as persuasive, not binding, authority.  *See* CR 76.28(4)(c).  Because *North Ridge Farms* was decided before Congress enacted the FSA, this Court reached its decision using the then-enacted UCC definition of farm products which included "crops or livestock used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states . . . and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations."  *North Ridge Farms*, 37 UCC Rep. Serv. at 1288.

Zayat Family purported to sell [AMERICAN PHAROAH] breeding rights Nos. 3-9 to Defendant Orpendale[.]" R. at 692.[12]  Furthermore, the amended complaint describes Justin Zayat as the President of Zayat Stables who is "in charge of the day-to-day operations of Zayat Stables." *Id.* at 643.  In light of these declarations, we are unconvinced by MGG's argument.

As determined by the circuit court, MGG could have provided the purchasers direct notice under 7 U.S.C. § 1631(e)(1) to protect its security interests.  MGG acknowledges the notice provisions of the FSA within the financing agreement.  Therein, Zayat Stables was required to:

> Provide to [MGG] a list of the buyers, commission merchants, selling agents and auctioneers to or through whom the Borrower may sell any of the Equine Collateral *pursuant to the provisions of Section 1324 of the Food Security Act of 1985, 7 U.S.C. 1631, in order that [MGG] may give notices required by, and enjoy protection afforded by, such Section.*  Schedule 7.01(q) attached hereto and made a part hereof sets forth the name and address of all such buyers, commission merchants, selling agents and auctioneers.  Borrower agrees to provide [MGG] with any additions or deletions from such Schedule immediately upon becoming aware of the same, and, in any event, to update such Schedule at least quarterly, and further agrees to notify the Collateral Agent, in writing, of the identity and address of any other buyer, commission merchant, or selling agent not included on such Schedule 7.01(q) at least seven (7) days prior to any sale of the Equine Collateral.  BORROWER ACKNOWLEDGES THAT PURSUANT TO 7 U.S.C.

---

[12] With regard to the sale of AMERICAN PHAROAH breeding rights Nos. 1 and 2, MGG asserts "Zayat Stables and Justin Zayat" purported to sell the shares to Foxwoods.  R. at 689.

-16-

> 1631(h)(3), BORROWER'S FAILURE TO COMPLY
> WITH THE PROVISIONS OF THIS SECTION 7.01(q)
> MAY SUBJECT BORROWER TO A FINE IN THE
> AMOUNT OF $5,000,000 OR 15% OF THE VALUE
> OF THE BENEFIT RECEIVED FROM SUCH
> COLLATERAL, WHICHEVER IS GREATER.

R. at 818 (emphasis added).[13]

This provision of the financing agreement shows MGG was aware of the requirement of direct notice to a purchaser of equine collateral to protect a security interest. Furthermore, we are unconvinced by MGG's claim that this reference to the FSA "does not indicate that the parties intended the FSA to govern the sales[.]" Reply Brief at 14. In fact, citation to the FSA in the financing agreement is evidence of acknowledgment by the parties of the applicability of the statute to any potential sale of equine collateral. To find otherwise would be illogical. MGG would not have required Zayat Stables to provide names and addresses of purchasers in order to provide notice under 7 U.S.C. § 1631(e) to protect its security interests if the parties did not believe 7 U.S.C. § 1631(d) applied to the relevant sales herein.

MGG next argues the circuit court erred in finding KRS 413.242 bars its claims against Yeomanstown.

> Before a party possessing a security interest or lien
> against an equine interest that has been sold without the

---

[13] Schedule 7.01(q) includes Keeneland Association, Inc., Fasig-Tipton Company, Inc., and Ocala Breeders' Sales Company. R. at 879. No appellee is named therein.

-17-

> debt to the party being discharged may bring an action against the purchaser or selling agent of the equine interest, the secured party shall pursue a remedy against the debtor to the point where a judgment is rendered on the merits or the suit is dismissed with prejudice.

KRS 413.242. Within its argument, MGG first claims it complied with the requirements of the statute by attempting to distinguish the "claims" it brought against Yeomanstown within its action against Zayat Stables from a separate "action" it could have brought against Yeomanstown. Essentially, MGG argues its claims are not barred by KRS 413.242 because they were brought within the action against the debtor, Zayat Stables, rather than as a separate action against the purchaser, Yeomanstown.

"[I]t is axiomatic that, when interpreting a provision of a statute, a court should not, if possible, adopt a construction that renders a provision meaningless or ineffectual or interpret a provision in a manner that brings about an absurd or unreasonable result." *Schoenbachler v. Minyard*, 110 S.W.3d 776, 783 (Ky. 2003) (footnotes omitted). The statute plainly states the legislature intended for creditors to pursue actions against sellers "to the point where a judgment is rendered on the merits or the suit is dismissed with prejudice" prior to pursuing any action against a purchaser. KRS 413.242. The intention of the legislature for suits against debtors to first reach finality is unambiguous. Were we to adopt MGG's theory differentiating between a "claim" and an "action," security interest

holders would be empowered to entirely circumvent KRS 413.242 by filing an action which includes claims against both the debtor and purchaser at once. This would effectively render KRS 413.242 meaningless, an outcome strongly disfavored by our jurisprudence. *Brooks v. Commonwealth*, 217 S.W.3d 219, 223 (Ky. 2007); *Commonwealth v. Phon*, 17 S.W.3d 106 (Ky. 2000); *DeStock No. 14, Inc. v. Logsdon*, 993 S.W.2d 952 (Ky. 1999). Therefore, MGG's amendment of the complaint against Zayat Stables to include claims against Yoemanstown is not sufficient for compliance with KRS 413.242.

MGG further argues, regardless of its noncompliance with KRS 413.242, the statute is unconstitutional under Section 2 of the Kentucky Constitution.[14] Section 2 of the Kentucky Constitution states, "[a]bsolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." The Supreme Court of Kentucky has held "whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary." *Commonwealth Natural Resources and Environmental Protection Cabinet v. Kentec Coal Co., Inc.*, 177 S.W.3d 718, 726 (Ky. 2005) (citation omitted). Where economic rights are involved, the

---

[14] MGG provided notice to the Attorney General of its constitutional challenge to KRS 413.242 as required by KRS 418.075. The Attorney General declined to intervene in this action.

purpose of the statute must be rationally related to a legitimate state objective.
*Beshear v. Acree*, 615 S.W.3d 780, 816 (Ky. 2020) (citation omitted).

MGG contends there is no rational basis for such a distinction and attempts to place the burden of identifying such a rationale on both Yeomanstown and the circuit court.[15]  However, MGG solely bears the burden of dispelling any conceivable basis which might justify the statute.  *Buford v. Commonwealth*, 942 S.W.2d 909, 911 (Ky. App. 1997).  "A strong presumption exists in favor of the constitutionality of a statute.  Furthermore, one who seeks to have a statute declared unconstitutional bears the burden of dispelling any conceivable basis which might justify the legislation."  *Id.* (citation omitted).

> A rational basis may be any reasonable basis or substantial and justifiable reason.  A person challenging a law upon equal protection grounds under the rational basis test has a very difficult task because a law must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  Furthermore, the General Assembly need not articulate its reasons for enacting the statute, and . . . has great latitude to enact legislation that may appear to affect similarly situated people differently.

*Teco/Perry County Coal v. Feltner*, 582 S.W.3d 42, 47 (Ky. 2019) (citations omitted).  Furthermore, we need not agree with the wisdom or expediency of the

---

[15] Although the circuit court did not directly address the constitutionality of KRS 413.242 in its judgment, in granting Yeomanstown's motion to dismiss the court implicitly found the statute constitutional.  The parties did not file post-judgment motions under CR 52.02 or CR 59.05.

General Assembly's purpose for a statute for it to be constitutional. *Buford*, 942 S.W.2d at 911.

MGG argues KRS 413.242 unconstitutionally creates an arbitrary classification favoring purchasers of equine interests over all other purchasers. "We will accept at face value contemporaneous declarations of governmental purposes, or in the absence thereof, rationales construed after the fact, unless our examination of circumstances forces us to conclude that they could not have been a goal of the classification." *Commonwealth ex rel. Stumbo v. Crutchfield*, 157 S.W.3d 621, 624 (Ky. 2005) (citation omitted).

The General Assembly unquestionably has the power to enact such statutes. *Munday v. Mayfair Diagnostic Laboratory*, 831 S.W.2d 912, 914 (Ky. 1992) (citation omitted). Kentucky's appellate courts have repeatedly upheld the constitutionality of statutes of limitation even where they arguably conflict with sections of the Kentucky Constitution. *Id.* "[P]rovisions of statutes of limitations should not be lightly evaded." *Id.* (citation omitted). Acceptance of MGG's argument regarding the constitutionality of KRS 413.242 would violate these settled principles and would call into question the constitutionality of many provisions of KRS Chapter 413.

Furthermore, as identified by Yeomanstown, numerous Kentucky statutes treat the equine industry in a manner different from the way in which other

industries within the Commonwealth are treated. *See* KRS 139.531 (exempting certain equine sales from application of taxes); *see also* KRS 330.210 (regulating the sale of horses by auction); KRS 525.130 (exempting killing of animals at organized horse races or shows from cruelty to animals and imposing additional penalties for offenses arising from a person's treatment of an equine). In fact, the entirety of KRS Chapter 230 separately regulates the horse racing and showing industries.[16] Furthermore, in enacting KRS Chapter 230, "the intent of the Commonwealth [was] to foster and to encourage the horse breeding industry within the Commonwealth and to encourage the improvement of the breeds of horses[,]" as well as "to foster and to encourage the business of legitimate horse racing with pari-mutuel wagering thereon in the Commonwealth on the highest possible plane." KRS 230.215(1). Although not part of Chapter 230, KRS 413.242 can undoubtedly be rationally related to the same government interests. Therefore, as MGG is unable to dispel all conceivable rationales for the General Assembly's enactment of KRS 413.242, the statute is not unconstitutional.

Next, MGG argues its claims against Yeomanstown were timely. "An action for the taking, detaining or injuring of personal property, including an action

---

[16] *See* KRS 230.225 (establishing the Kentucky Horse Racing Commission); KRS 230.280 to KRS 230.310 (regulating licensure for horse racing); KRS 230.357 (regulating sales, purchases, and transfers of horses); KRS 230.781 (exempting international racing hubs from fees and taxes); KRS 230.804 (establishing the Kentucky horse breeders' incentive fund and regulating the disbursement of monies from the fund); and KRS 230.990 (establishing penalties for violations of statutes).

for specific recovery shall be commenced within two (2) years from the time the cause of action accrued." KRS 413.125. Yoemanstown purchased EL KABEIR from Zayat Stables on September 20, 2017. MGG amended its complaint to bring claims against Yeomanstown on February 11, 2020, more than four months after the expiration of the statute of limitations. MGG concedes to these facts but argues its claims are timely with application of the discovery rule.

Under the discovery rule, a cause of action does not accrue "until the plaintiff discovers or[,] in the exercise of reasonable diligence[,] should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct." *R.T. Vanderbilt Co., Inc. v. Franklin*, 290 S.W.3d 654, 659 (Ky. App. 2009) (citation omitted). "Reasonable diligence means that a plaintiff must be as diligent as the great majority of persons would [be] in the same or similar circumstances[.]" *Id*. (citations omitted). This rule is available only in the limited circumstances in which an injury is not readily discoverable or ascertainable. *Wiseman v. Alliant Hospitals, Inc.*, 37 S.W.3d 709, 712 (Ky. 2000) (citations omitted). The discovery rule is most often applied to cases involving latent injuries or illnesses. *Mark D. Dean, P.S.C. v. Commonwealth Bank & Trust Co.*, 434 S.W.3d 489, 502 (Ky. 2014) (citation omitted). Kentucky courts have generally been reluctant to extend the discovery rule where they are without the

statutory authority to do so. *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 288 (Ky. App. 1998) (citations omitted).

No statutory authority exists for applying the discovery rule to the circumstances herein. Furthermore, this case is easily distinguishable from those where the rule has been applied, namely those involving latent injuries or illnesses. Here, MGG suffered no latent injury attributable to Yeomanstown's actions.[17]

Had MGG exercised reasonable diligence, it would have discovered Zayat Stables' sale of EL KABEIR to Yeomanstown. While Zayat Stables may have failed to comply with its obligation to notify MGG of the sale, MGG had other means of discovering it. Primarily, it is uncontroverted that MGG had, under the financing agreement, inspection rights which allowed agents of MGG to, with written notice to Zayat Stables, "visit, inspect and conduct such examinations as they may elect in their sole and absolute discretion[.]" R. at 814. As part of its inspection rights, MGG was empowered

> (A) to examine and make copies of and abstracts from [Zayat Stables'] records and books of account, (B) to visit, inspect and examine [Zayat Stables'] Equine Collateral and other properties, (C) to permit Equine Appraisers to visit, inspect and examine [Zayat Stables'] Equine Collateral in connection with Equine Appraisals permitted hereunder, (D) to verify materials, leases, notes, accounts receivable, deposit accounts and [Zayat Stables'] other assets, (E) to conduct audits, physical

---

[17] In fact, MGG does not allege any wrongdoing attributable to Yeomanstown. Instead, MGG alleges only wrongdoing by Zayat Stables in concealing the sale of EL KABEIR.

-24-

> counts, valuations, appraisals, or examinations and (F) to discuss [Zayat Stables'] affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives[.]

*Id.* MGG was also entitled to equine appraisals at Zayat Stables' expense. *Id.* MGG's failure to exercise these inspection rights is fatal to any claim that the injury it suffered was "inherently unknowable" within the statutory period. *Wilson v. Paine*, 288 S.W.3d 284, 287 (Ky. 2009) (citation omitted).

In the alternative, MGG argues it is entitled to equitable tolling as to its claims against Yeomanstown. "Equitable tolling pauses the running of, or tolls, a statute of limitations when a litigant has pursued his rights diligently, but some extraordinary circumstance prevents him from bringing a timely action." *Williams v. Hawkins*, 594 S.W.3d 189, 193 (Ky. 2020) (citing *Lozano v. Montoya Alvarez*, 472 U.S. 1, 10, 134 S. Ct. 1224, 1231-32, 188 L. Ed. 2d 200 (2014)). "[T]o be entitled to equitable tolling, a litigant must establish: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing, with those circumstances being beyond the litigant's control." *Id.* at 194 (internal quotation marks and citation omitted). It is incumbent on plaintiffs to locate and name the proper party defendant. *Id.* at 195 (citation omitted).

The circuit court, in dismissing MGG's claims against Yeomanstown without prejudice, held "[e]quitable [t]olling could or may apply to the case at bar, but the [c]ourt does not currently have sufficient evidence before it to make this determination." R. at 1357. Again, MGG argues only that Zayat's actions in failing to comply with the security agreement in reporting the sale entitles it to equitable tolling of its claims against Yeomanstown. This claim must fail on the same grounds as MGG's argument for application of the discovery rule. Had MGG exercised its inspection rights and practiced reasonable diligence, it would have discovered the sale. MGG fails to identify any extraordinary circumstance *beyond its control* which entitles it to equitable tolling.

## **CONCLUSION**

Accordingly, the judgments of the Fayette Circuit Court on MGG's claims against Hill 'N' Dale, Foxwoods, McMahon, Orpendale, Flintshire, Sears, and Bemak are affirmed. The judgment on MGG's claims against Yeomanstown is affirmed in part, reversed in part, and remanded with direction for the circuit court to enter a judgment dismissing the claims with prejudice.

ALL CONCUR.

BRIEFS FOR APPELLANT/CROSS-APPELLEE:

W. Craig Robertson III
Daniel E. Hitchcock
Thomas E. Travis
Lexington, Kentucky

Kannon K. Shanmugam
Stacie M. Fahsel
Tanya S. Manno
Brian M. Lipshutz
Washington, D.C.

ORAL ARGUMENT FOR
APPELLANT/CROSS-APPELLEE:

Kannon K. Shanmugam
Washington, D.C.

BRIEF FOR APPELLEE/CROSS-APPELLANT, MULL ENTERPRISES LIMITED D/B/A YEOMANSTOWN STUD:

Thomas D. Bullock
Rachele T. Yohe
Lexington, Kentucky

BRIEF FOR APPELLEE, HILL 'N' DALE EQUINE HOLDINGS, INC.:

David T. Royse
John C. Roach
Lexington, Kentucky

BRIEF FOR APPELLEE, MCMAHON OF SARATOGA THOROUGHBREDS, LLC:

Gregory P. Parsons
Marshall R. Hixson
Megan K. George
Lexington, Kentucky

BRIEF FOR APPELLEE, LNJ FOXWOODS, LLC:

W. Chapman Hopkins
Andrew J. Donovan
Lexington, Kentucky

BRIEF FOR APPELLEES, BEMAK N.V., LTD. & ORPENDALE UNLIMITED COMPANY:

Barry D. Hunter
Medrith Lee Norman
Lexington, Kentucky

BRIEF FOR APPELLEES,
FLINTSHIRE FARM, LLC &
THOMAS B. SEARS:

J. Mel Camenisch, Jr.
Megan R. Holt
Lexington, Kentucky

ORAL ARGUMENTS FOR
APPELLEES/CROSS-APPELLANT

David T. Royse
Lexington, Kentucky

Thomas D. Bullock
Lexington, Kentucky