RENDERED:  NOVEMBER 21, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0755-MR

2 BROTHERS MARKET, LLC,
AND SAFWAT BALLASI                                             APPELLANTS

v.              APPEAL FROM JEFFERSON CIRCUIT COURT
                HONORABLE SARAH E. CLAY, JUDGE
                ACTION NO. 23-CI-000576

KENTUCKY FARM BUREAU
INSURANCE COMPANY                                             APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, CETRULO, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  In the underlying declaratory judgment action, the Jefferson

Circuit Court, by opinion and order entered May 7, 2024, granted summary

judgment in favor of Kentucky Farm Bureau Insurance Company (KFB).[1]  The

court held that a commercial general liability (CGL) policy KFB issued to 2

Brothers Market, LLC, (2 Brothers) did not obligate KFB to defend or indemnify 2

Brothers or its member and employee, Safwat Ballasi, for Ballasi's fatal shooting

of Johnathon Dupin.  2 Brothers and Ballasi now appeal.  Upon review, we affirm.

## BACKGROUND

Our review of this matter begins with the allegations of the complaint

Dupin's Estate filed in Jefferson Circuit Court on September 28, 2021, which

triggered the underlying coverage dispute between KFB and 2 Brothers.  The

pertinent allegations were as follows:

> 1. The decedent, Johnathon Dupin, was at all times
> pertinent, a resident of Louisville, Jefferson County,
> Kentucky.  He died intestate.  Rod Dupin was appointed
> Administrator of the Estate of Johnathon Dupin.
>
> 2. Defendant, 2 Brothers Food Mart [sic], LLC, is now
> and has been at all pertinent times a Kentucky Limited
> Liability Company, registered with the Kentucky
> Secretary of State.  Currently, it is in active but in bad
> standing.  Said Defendant operates a grocery business
> located at 438 N. 28th Street, Louisville, Kentucky.
>
> 3. Defendant, Safwat Ballasi, is now and was at all
> pertinent times a resident of Louisville, Jefferson County,
> Kentucky.

---

[1] 2 Brothers Market, LLC, and Safwat Ballasi filed a Kentucky Rules of Civil Procedure (CR) 59
motion to alter, vacate, or set aside the Opinion and Order Granting Summary Judgment.  That
motion was denied by Order entered June 7, 2024.

4. Plaintiff brings this suit to recover damages for personal injuries and wrongful death.

5. Safwat Ballasi is an owner, member, agent, representative and employee of 2 Brothers Food Mart [sic]. The decedent also worked for 2 Brothers Food Mart [sic] as a clerk and stock person. Safwat Ballasi shot Mr. Dupin. As a result of being shot, Mr. Dupin died. Mr. Ballasi was charged with Reckless Homicide pursuant to KRS [Kentucky Revised Statutes] 507.050 and Tampering with Physical Evidence pursuant to KRS 524.100.

6. During the initial investigation, Defendant Ballasi, reported to the police that he was in the office of the store when he heard a shot. He came out of the office and saw Mr. Dupin shot. He also stated that the DVR video system of the store was not working.

7. The police recovered the DVR and discovered that Defendant Ballasi was armed with a handgun. While near Mr. Dupin, Def[endant] Ballasi manipulated the handgun multiple times before firing a gunshot that struck Mr. Dupin. The video also shows Mr. Ballasi approached the surveillance video and the DVR then stops recording. Mr. Ballasi unplugged the recorder. He intended to conceal the surveillance video from discovery. The handgun and spent casings were no longer at the scene when the police arrived.

8. Mr. Dupin was later pronounced deceased at the University of Louisville Hospital.

Record at 66-67.

Based upon those allegations, Dupin's Estate sued Ballasi for gross negligence in causing Dupin's injuries and death and sued 2 Brothers under the doctrine of respondeat superior. And, based upon those same allegations, KFB

-3-

initiated the underlying declaratory action in Jefferson Circuit Court on January 27, 2023, to dispute whether a CGL policy it had issued 2 Brothers obligated KFB to defend or indemnify 2 Brothers relative to the Dupin Estate's lawsuit. 2 Brothers claimed it did. KFB, citing the nature of 2 Brothers' business described in the declarations of the policy, along with the grant of coverage under the policy, insisted it did not. The declarations classified the nature of 2 Brothers' business as "Convenience Food Stores With Limited Cooking Restaurant – No Gasoline Sales[.]" The policy's grant of coverage provided in relevant part:

### SECTION II – LIABILITY

**A. Coverages**
  **1. Business Liability**
    **a**. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury[.]"

    . . . .

    **b**. This insurance applies:
      **(1)** To "bodily injury" . . . only if:
        **(a)** The "bodily injury" . . . is caused by an "occurrence" . . .

    . . . .

**C. Who is An insured**
  **1.** If you are designated in the Declarations as:

    . . . .

    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with

respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

. . . .

**2.** Each of the following is also an insured:
**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. . . .

. . . .

**F. Liability and Medical Expenses Definitions**

. . . .

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Record at 42, 43, 51, 52, 54, and 56.

KFB's theory of noncoverage chiefly relied upon two words in its policy: "insured" and "occurrence." KFB argued 2 Brothers could not be considered an "insured" because its only asserted liability was vicarious (*i.e.*, "respondeat superior"), by and through Ballasi; vicarious liability can only stem from conduct taken by an agent within the scope of the agent's duties; and Ballasi

– regardless of whether he was a member, manager, or employee of 2 Brothers – was not acting with respect to the conduct of 2 Brothers' business (*i.e.*, "Convenience Food Stores With Limited Cooking Restaurant – No Gasoline Sales"), with respect to his duties as a manager of that business, or within the scope of his duties as an employee of that kind of business when he shot Dupin. Therefore, KFB asserted, neither 2 Brothers nor Ballasi qualified as an "insured" within the meaning of the policy. KFB further argued that Ballasi's shooting of Dupin could not be considered an "accident," and thus failed to qualify as an "occurrence," because as part of a December 12, 2022, diversion agreement, Ballasi had pleaded guilty to reckless homicide[2] in connection with his shooting of Dupin.

In response to KFB's summary judgment motion, appellants filed a response which Ballasi verified under oath. Ballasi averred what had led to the shooting of Dupin as follows:

## FACTS

1. At all relevant times, 2 Brothers Market, LLC, has operated a convenience store located at 438 N. 28th Street, Louisville, KY 40212.

2. Safwat Ballasi is the sole member of 2 Brothers Market, LLC. He is known as "the owner," "the boss," "general manager," and the "manager," and at the time of these events he was inside the store acting as such.

[2] *See* Kentucky Revised Statute (KRS) 507.050.

-6-

3. On March 31, 2012 [sic], at the above noted location of 2 Brothers Market, LLC, a regular customer of the convenience store came to the store, purchased inventory, and then, later, offered to show Ballasi two guns he had in his possession.

4. As it happened, Ballasi's friend, and also occasional customer of the convenience store, Jonathan Dupin, was present when the regular customer offered to shoe [sic] Ballisi [sic] the guns.

5. Ballis [sic] agreed to be shown the guns, and Dupin was present when the guns were shown.

6. At a certain point, Ballisi [sic] held one of the guns, and while holding it, he removed the magazine. Ballisi [sic] did not realize a round had been previously chambered, and believed the gun to be empty. While examining the gun, the gun accidentally discharged, a bullet accidentally hit Dupin, causing Dupin accidental bodily injury, and subsequently, accidental death.

Record at 357.

Appellants argued they were entitled to coverage under the policy because, in their view, Ballasi's averments set forth above demonstrated Ballasi had been acting within his duties as 2 Brothers' store manager when he shot Dupin:

On the day in question, a regular customer came to 2 Brothers and purchased something from the store. The regular customer also brought a gun into 2 Brothers to show Ballisi [sic]. There was nothing illegal or unusual about the customer carrying a gun. Ballis [sic] did not solicit the gun being brought into the store, nor did he prohibit it. It was the customer's right to carry a gun; it

was the customer's right to offer to show it to Ballisi [sic]; it was Ballisi's [sic] right to inspect the gun when the inspection was offered. At the time the regular customer brought the gun into 2 Brothers, Ballisi [sic], the owner, was inside the store in his capacity as general manager. Interacting with customers, armed or otherwise, is what Ballisi [sic] does for a living at 2 Brothers Market.

. . . .

Not all interactions involve Ballis [sic] on one side of a counter, with the customer on the other side, and a sale happening. Sometimes customers, such as Jon Dupin, simply come in to talk and chat with Ballis [sic]. Sometimes a customer might need help getting groceries to their car; Ballis [sic] can help. Sometimes a customer's battery might go dead; Ballisi [sic] can help with a jump. Sometimes a customer wishes to show something to Ballisi [sic]; it costs Ballisi [sic] nothing to look, and helps build rapport with the customer, which is good for business.

Record at 358-59.

As indicated, the circuit court granted summary judgment in favor of KFB. The court's premise for granting summary judgment was not that appellants failed to qualify as "insureds" under the policy. Rather, the court held Dupin's death could not be deemed the result of an "occurrence" under the policy because Ballasi had pleaded guilty to reckless homicide in connection with the shooting. This appeal followed. Additional facts will be discussed as necessary.

## STANDARD OF REVIEW

A party seeking a declaratory judgment may move (with or without supporting affidavits) for a summary judgment in his favor. *Foreman v. Auto Club Property-Casualty Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021). Upon our review, we determine whether the record supports the trial court's conclusion that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rules of Civil Procedure (CR) 56.03. Because the interpretation of an insurance contract is a matter of law, our review is *de novo*. *Foreman*, 617 S.W.3d at 349. Where provisions of an insurance contract are unambiguous and reasonable, they are enforced as written. *Id*.

## ANALYSIS

We begin with the basis of the circuit court's judgment, *i.e.*, that Dupin's death could not be deemed an "accident," and thus failed to qualify as an "occurrence" under the language of the CGL policy, because Ballasi pleaded guilty to reckless homicide in connection to it. The circuit court apparently believed Ballasi's guilty plea had a preclusive, collateral estoppel effect in this matter that entitled KFB to judgment as a matter of law. We disagree.

As discussed, Ballasi pleaded guilty to reckless homicide as part of a diversion agreement. Accordingly, even if his plea had related to an offense that could be considered nonaccidental, it had no collateral estoppel effect and thus

would not have precluded Ballasi from claiming Dupin's death had resulted from an "occurrence" or "accident" within the meaning of the CGL policy. An essential element of collateral estoppel is a final judgment. *See Moore v. Commonwealth, Cabinet for Human Res.*, 954 S.W.2d 317, 319 (Ky. 1997). A mere guilty plea without an accompanying imposition of a sentence – which is precisely what occurred relative to Ballasi's diversion agreement stemming from his shooting of Dupin – cannot qualify as a final judgment. *See Cook v. Commonwealth*, 129 S.W.3d 351, 365 (Ky. 2004), explaining:

> Criminal Rule 11.04(1) provides now, as it did in 1972, that "[a] judgment of conviction shall set forth the plea, the verdict or findings, the adjudication *and sentence* . . . . " (Emphasis added.) Until a final judgment was entered, the Whitley Circuit Court retained jurisdiction to alter, amend or vacate Appellant's convictions. . . .

There is no dispute that Ballasi fulfilled the diversion agreement and that his reckless homicide charge was later dismissed pursuant thereto. Accordingly, his guilty plea to reckless homicide associated with his diversion agreement cannot be considered a criminal conviction or final judgment. *See* KRS 533.258(1).

However, "[i]f an appellate court is aware of a reason to affirm the lower court's decision, it must do so, even if on different grounds." *Mark D. Dean, P.S.C. v. Commonwealth Bank & Trust Co.*, 434 S.W.3d 489, 496 (Ky. 2014). Based upon our review of the record, we agree with KFB's alternative

argument that Ballasi shooting Dupin was not within the scope of the policy's coverage, and thus Ballasi was not an "insured" within the meaning of 2 Brothers' CGL policy for this claim.

As indicated from the language of KFB's CGL policy, whether Ballasi and 2 Brothers qualified as an "insured" in this context depended upon whether Ballasi was acting within the scope of his employment when he shot Dupin. To be sure, the complaint filed by Dupin's Estate asserted Ballasi had been doing so. However, a liability insurer's duty to defend its insured from a lawsuit is determined by the factual allegations of the complaint. *See James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991). An assertion that an employee acted within the scope of his or her duties is not a factual allegation, but a mere legal conclusion. *See Hensley v. Traxx Mgt. Co.*, 622 S.W.3d 652, 658 (Ky. 2020) (explaining whether an employee's conduct is within the scope of their employment is a question of law). Furthermore, ascertaining whether a given act was within the scope of employment is not simply a matter of determining whether the act occurred during the employee's shift or on the business's premises, or whether the act that led to the shooting was of some tangential benefit to the master's business. The critical inquiry is whether the act – in this case, the act that led to the shooting of Dupin – was committed by the employee while in the course of prosecuting the employer's business.

-11-

For example, in *Employers' Liability Assurance Corporation. v. Home Indemnity Company*, 452 S.W.2d 620 (Ky. 1970), a customer, Allen, undertook to buy some chairs at the store of Sun TV No. 2, Inc. Schamback, a stockholder and manager of Sun TV No. 2, waited on Allen. When it was noted that the price for the chairs was not marked on them, Schamback accompanied Allen to Schamback's office to examine a price list. Schamback's briefcase was lying open on top of a file cabinet with a revolver on top of various documents in the briefcase. Schamback picked up the revolver in order to reach the papers but turned momentarily to show Allen the weapon. Unexplainedly the pistol fired, wounding Allen. Schamback recounted the incident occurred within a "couple of seconds," and after he had moved the gun less than a foot. *Id*. at 621.

Ultimately, Schamback was deemed to have acted within the scope of his employment and was thus considered an "insured" under the similar terms of his company's CGL policy.[3] However, this was not simply because Schamback was on his company's business premises or because he was working his shift. In addition to those factors, the Court regarded "Schamback's position and duties as creating reasonable foreseeability of his keeping a revolver for protection of

---

[3] The operative commercial general liability (CGL) policy in *Employers' Liability Assurance Corporation v. Home Indemnity Company*, 452 S.W.2d 620 (Ky. 1970), similarly deemed an "insured" to include "any executive officer, director or stockholder of the Named Insured but only while acting within the scope of his duties as such[.]" *Id*. at 622.

-12-

himself and the store and its contents[,]" *id*. at 623; and the court noted that the accident had occurred while Schamback "was dealing with a customer of the store, attempting to complete a sale[,]" and thus "while he was attempting to attend to Sun's business." *Id*.

In *Frederick v. Collins*, 378 S.W.2d 617 (Ky. 1964), an employee of a neighborhood grocery shot and killed a frequent patron of the store who disguised his voice and said, "Stick'em up; this is a hold up." *Id*. at 618. The employee turned around, hit the patron in the face with a gun, and shot him without realizing who it was. The employee was the storeowner's son. The owner testified that he did not know his son had a gun and that he had frequently instructed all of his employees, including his son, never to resist a holdup. *Id*. The question before the Court was whether the owner could be held vicariously liable for the shooting, an intentional tort. The Court noted that *Prosser on Torts*, 2nd ed., had recognized "that even intentional torts may be so reasonably connected with the employment as to fall within the scope of it. The present tendency is to extend the employer's responsibility for such conduct." *Id*. (citation omitted). The Court then favorably cited § 245 of the RESTATEMENT (SECOND) OF AGENCY, which states that the master is liable "for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although

the act was unauthorized, if the act was not unexpectable in view of the duties of the servant."

In finding that the employee was acting within the scope of employment, the Court placed great weight on his motive for the shooting. The Court stated:

> In the case at bar Robert was admittedly the appellant's employee; moreover, he was in sole charge of the store at the time of the incident. Without doubt Robert Frederick was under obligation generally to manage and protect the appellant's store and its contents. There is no evidence that Robert sought to serve any personal purpose in his activity toward Collins. In fact, Robert asserted that he did not know whom he was shooting—that he acted in self-defense. He actually testified that he would have shot his father or brother under the same circumstances. So it is obvious that this case is not governed by any of the authorities which deny liability because the employee has acted in furtherance of a personal motive as distinguished from a motive connected with the employer's business.

*Frederick*, 378 S.W.2d at 619.

By contrast, shootings are not within the scope of an employee's duties where they are motivated by purely personal reasons. For example, as summarized and cited with approval in *Wood v. Southeastern Greyhound Lines*, 302 Ky. 110, 194 S.W.2d 81 (1946):

> A store employee who, when at work, shot another employee with a gun which was in a store, was held not acting within the scope of employment so as to render the store owner liable therefor. An act is within the scope of

-14-

> the servant's employment, where such act is *necessary to accomplish the purpose of his employment*, and *intended for that purpose*, although in excess of the powers actually conferred on the servant by the master. *Hough v. Leech*, 187 Ark. 719, 62 S.W.2d 14.

*Id*. at 83 (emphasis added).

Upon review of applicable precedent and the record below, clearly Ballasi did not accidentally discharge a gun that could have been viewed as a tool of his business, nor did he do so while attempting to complete a sale. To the contrary, Ballasi admitted in his answers to KFB's interrogatories that he did not own the gun he fired at Dupin and had never seen it before that date. And, by his own verified admission set forth in his response to KFB's motion for summary judgment, Ballasi obtained the weapon after "a regular customer of the convenience store came to the store, purchased inventory, and then, *later*, offered to show Ballasi two guns he had in his possession." Record at 357 (emphasis added). Unlike the employee in *Frederick*, 378 S.W.2d 617, Ballasi also did not use the gun in an attempt to defend himself from a foreseeable threat of harm posed by his employment.

Appellants argued below that Ballasi was acting with respect to the conduct of 2 Brothers' business, in accordance with his duties as a manager of that business, and/or within the scope of his duties as an employee of that business when he shot Dupin because: (1) Ballasi shot Dupin while he was working his

shift as 2 Brothers' manager; (2) the shooting occurred on 2 Brothers' business premises; (3) Ballasi shot Dupin with a gun obtained from his interaction with a 2 Brothers customer; and (4) interacting with customers and building rapport with them were parts of Ballasi's everyday duties as a manager and were "good for business." Record at 359.

As set forth in our analysis, however, those are not the relevant considerations. And, even if Ballasi subjectively believed that his manipulation of the handgun which led to Dupin's death somehow accomplished a purpose of 2 Brothers' business, his actions in that regard were obviously not "*necessary* to accomplish the purpose of his employment[.]" *Wood*, 194 S.W.2d at 83 (emphasis added). As set forth in the declarations of its CGL policy with KFB, 2 Brothers is in the business of operating "Convenience Food Stores With Limited Cooking Restaurant – No Gasoline Sales[.]" It is not in the business of inspecting the firearms of its customers. Thus, regardless of whether Ballasi was inspecting the handgun that ultimately killed Dupin or simply playing with it, his act cannot be considered within the scope of 2 Brothers' business, within the scope of Ballasi's conduct of its business, or within the scope of Ballasi's duties as its employee. *Id*. As such, neither Ballasi, nor 2 Brothers (by virtue of vicarious liability principles), were "insureds" under the CGL policy issued by KFB as concerns the shooting of

Dupin as the incident was outside the scope of the policy's coverage. They were accordingly entitled to no coverage.

## CONCLUSION

For the foregoing reasons, the opinion and order granting Kentucky Farm Bureau Insurance Company summary judgment by the Jefferson Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Gregory Ward Butrum
Louisville, Kentucky

BRIEF FOR APPELLEE:

J. Michael Wells
Louisville, Kentucky